INTERNATIONAL LADIES' GARMENT WORKERS' UNION, et al., Appellants,

v.

Raymond J. DONOVAN, et al.

No. 82–2133.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 1983.
Decided Nov. 29, 1983.

Stephen J. Pollak, Washington, D.C., with whom S. Elizabeth Gibson, Andrew H. Marks, Washington, D.C., and Max Zimny, New York City, were on brief, for appellants.

Marilyn S.G. Urwitz, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul

McGrath, Asst. Atty. Gen., Robert S. Greenspan, Atty., Dept. of Justice, and Ruth Peters, Atty., Dept. of Labor, Washington, D.C., were on brief, for appellees, Donovan, et al.

Joseph D. Alviani and Robert R. Ruddock, Boston, Mass., were on brief, for appellees, Breen, et al.

Patricia A. Embrey, Washington, D.C., was on brief, for appellee, Stowe Woolens, Ltd.

Michael E. Avakian, Center on National Labor Policy, Inc., North Springfield, Va., for amicus curiae.

Before WRIGHT and EDWARDS, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This action arises out of the decision of the Secretary of Labor (hereinafter "the Secretary") to rescind longstanding restrictions on the employment of workers in their homes (homeworkers) in the knitted outerwear industry. 46 Fed.Reg. 50,349 (1981). The knitted outerwear industry consists of those firms that knit from yarn and, in the same establishment, further manufacture, dye or finish knitted garments, garment sections, or accessories for use as external apparel, and those firms that manufacture bathing suits from any purchased fabric. 29 C.F.R. § 530.1(f) (1981) (rescinded by 46 Fed.Reg. 50,349 (1981)). This industry employs approximately 63,000 production workers. 46 Fed.Reg. 50,349 (1981).

The appellants—knitted outerwear manufacturers and manufacturers' associations, labor organizations representing factory workers in the industry, and state labor law enforcement officials—brought suit, principally arguing that the rescission was arbitrary and capricious within the meaning of § 10(e) of the Administrative Procedure Act (hereinafter the "APA"), 5 U.S.C. § 706(2)(A) (1982). Their concern is that when homeworkers are employed it is not possible effectively to enforce the minimum wage, overtime compensation and child labor provisions of the Fair Labor Standards Act of 1938 (hereinafter "the Act"), 29 U.S.C. §§ 201–219 (1976 & Supp. V 1981). They also claim that payment of subminimum wages to homeworkers in the industry will cause competitive injury to employers complying with the Act and will drive down the wages of all employees in the industry. The District Court denied the appellants' motion for summary judgment and granted summary judgment for the appellees.

Because we find that the Secretary's decision was arbitrary and capricious, we reverse the decision of the District Court and vacate the action of the Secretary rescinding restrictions on the employment of homeworkers. We will remand the case to the District Court with instructions to return the matter to the Secretary for further proceedings, as may be appropriate, consistent with the opinion of this court.

## I. BACKGROUND

### A. The History of Restrictions on Industrial Homework

To appreciate the significance of the Secretary's decision, one must first understand the historical context in which it arose. The concerns about industrial homework raised by the appellants echo those voiced by critics of substandard labor conditions throughout this century. See WAGE & HOUR DIV., U.S. DEP'T OF LABOR, IN THE MATTER OF THE RECOMMENDATION OF INDUSTRY COMMITTEE NO. 32 FOR A MINIMUM WAGE RATE IN THE KNITTED OUTERWEAR INDUSTRY AND INDUSTRIAL HOME WORK IN THE KNITTED OUTERWEAR INDUSTRY, FINDINGS AND OPINION OF THE ADMINISTRATOR 13 (1942) (hereinafter "1942 FINDINGS"), reprinted in I Joint Appendix ("J.A.") 79 ("The problems inherent in [homework] have been recognized for a long period of time."). The history of legislative attempts to remedy such concerns evinces an evolving recognition of the need for restriction, rather than mere regulation, of industrial homework in industries in which it is pervasive.

Regulation of homework was initially undertaken by the states around the turn of the century. Between 1871 and 1904, twelve states enacted statutes either bar-

ring conversion of homes into industrial workshops or requiring inspection and registration of homework. Comments of International Ladies' Garment Workers' Union 10 (July 1, 1981) (hereinafter "ILGWU Comments"), *reprinted in* II J.A. 308. In the early 1900's, commissions in at least two of these states reported that regulatory efforts had been failures. *Id.* at 13, II J.A. 311 (quoting reports from Pennsylvania and Massachusetts). A commission in New York found that

> [h]ome work means unregulated manufacturing carried on beyond the possibility of control as to hours of women's work, child labor, night work of minors or cleanliness and sanitation of work places. From the point of view of the community the greatest objection to home work is its essential lawlessness.

*Quoted in* 1942 FINDINGS, *supra*, at 13, *reprinted in* I J.A. 79 (footnote omitted).

By the mid-1930's, there was increasing support for the prohibition of homework.[1] Under the National Industrial Recovery Act, codes of fair competition were drawn up for 556 industries, and provisions for regulation or prohibition of homework were included in 118. Approximately one hundred of the codes "provided for the complete abolition of homework." BRANCH OF RESEARCH & STATISTICS, WAGE & HOUR & PUBLIC CONTRACTS DIV., DEP'T OF LABOR, EMPLOYMENT OF HOMEWORKERS UNDER THE FAIR LABOR STANDARDS ACT 15 (1959) (hereinafter "1959 REPORT"), *reprinted in* II J.A. 489. The National Industrial Recovery Act subsequently was found unconstitutional by the Supreme Court in *Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). However, one year later the United States' Children's Bureau reported on the relative effectiveness of *prohibition* and *regulation* under the codes prior to *Schechter:*

> Great gains were made where the codes prohibited the giving out of home work. But in the industries in which home work was still permitted, even though limited by certain regulations, the ancient evils continued to exist and to constitute a menace to the higher labor standards that had been achieved for factory workers.

U.S. CHILDREN'S BUREAU, INDUSTRIAL HOMEWORK UNDER THE NATIONAL RECOVERY ADMINISTRATION 21 (1936), *quoted in* ILGWU Comments, *supra*, at 14, *reprinted in* II J.A. 312 (footnote omitted).

■ In 1938, Congress passed the Fair Labor Standards Act of 1938,[2] the "central aim" of which "was to achieve, in those industries within its scope, certain minimum labor standards." *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960). *See also Southland Gasoline Co. v. Bayley,* 319

---

1. The comments received during the Department of Labor's notice and comment rulemaking in 1981 included submissions from five former Secretaries of Labor—Peter Brennan, Willard Wirtz, Ray Marshall, Arthur Goldberg and John Dunlop. These Secretaries criticized the proposal to legalize homework and cited a number of reports from the 1930's:

> In the 1930's, a study of the Bureau of Women and Children of the Pennsylvania Department of Labor concluded: "Homework can never be regulated. No matter how stringent the regulations, how great the enforcement, how honest the investigators, the sweatshop conditions will continue to exist unless homework is abolished."
>
> . . . .
>
> In a study of homework in Rhode Island, the Women's Bureau said flatly: "Effective regulation of homework is impossible." In particular, it pointed out, "the prevention of child labor is practically impossible."

A special committee appointed by President Roosevelt to review the administration of the National Industrial Recovery Act concluded that "homeworkers did not come to enjoy code wage standards, even in industries where the regulations were severe and enforcement was exacting ... The provisions failed most conspicuously in regulating hours of employment and child labor. It was found that only complete prohibition could eradicate the evils of industrial homework." Comments of Peter Brennan (May 21, 1981), *reprinted in* I J.A. 172–73; Comments of Willard Wirtz, Ray Marshall and Arthur Goldberg (May 25, 1981), *reprinted in* I J.A. 174–75; Comments of John T. Dunlop (June 1, 1981), *reprinted in* I J.A. 176–77 (hereinafter collectively referred to as "Secretaries' Comments").

2. Pub.L. No. 75–718, 52 Stat. 1060 (1938) (codified as amended at 29 U.S.C. §§ 201–219 (1976 & Supp. V 1981)).

U.S. 44, 48, 63 S.Ct. 917, 919, 87 L.Ed. 1244 (1943).[3] The Act established minimum hourly wages for employees,[4] limited the number of hours employees could work without receiving overtime compensation,[5] and prohibited oppressive child labor.[6] Section 11(c) of the Act required employers to keep and make available records of employees' wages and hours.[7] Shortly after passage of the Act, the Administrator (hereinafter "the Administrator") of the Wage and Hour Division (hereinafter "the Division") issued a statement interpreting the Act to cover workers whether they worked at home or in the factory. *See* 1959 REPORT, *supra,* at 18, *reprinted in* II J.A. 492. All employers of homeworkers were required to keep special records indicating the identity of homeworkers and the time worked and piece rates paid with respect to each lot of work issued. *See* 1942 FINDINGS, *supra,* at 19–20, *reprinted in* I J.A. 85–86. Employers were also required to obtain handbooks from the Division and distribute them to homeworkers they employed so that the homeworkers would have records of times worked and rates paid. These handbooks would be retained by the homeworker except during the time necessary for the employer to complete a periodic entry required by the regulations. *Id.* at 20, I J.A. 86.

Soon after the promulgation of these regulations, pressures to prohibit homework intensified. A number of states had taken such action,[8] and a 1940 national conference on labor legislation composed of government representatives from almost every state recommended that the Division seriously consider prohibition of industrial homework. *Id.* at 13, I J.A. 79. Between 1941 and 1943, the Division held hearings "for seven industries in which homework was most prevalent and in which violations of the Fair Labor Standards Act had been a problem" (1959 REPORT, *supra,* at 19, *reprinted in* II J.A. 493): the jewelry, knitted outerwear, gloves and mittens, button and buckle, embroidery, handkerchief and women's apparel industries.

One outgrowth of these hearings, and the related investigations of the Division, was a series of reports issued by the Division. Because the reports represent the most comprehensive analysis by the Department of Labor (hereinafter "the Department") of homework and methods of regulating it, we deem it appropriate to summarize at length the conclusions of the report dealing with the knitted outerwear industry.[9] The Administrator reported that officials charged with enforcing the Act "are of the opinion that there is almost universal violation of the record-keeping requirements of the Wage and Hour Division with respect to home workers." 1942 FINDINGS, *supra,* at 22, *reprinted in* I J.A. 88. Actual inspection

---

3. It is clear, however, that the Act was also concerned with the employment consequences of achieving this objective. *See id.* § 2(b), 52 Stat. at 1060 (codified as amended at 29 U.S.C. § 202(b) (1976)) ("It is hereby declared to be the policy of this Act, through the exercise by Congress of its power to regulate commerce among the several States, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power.").

4. *Id.* § 6, 52 Stat. at 1062–63 (codified as amended at 29 U.S.C. § 206 (1976 & Supp. V 1981)).

5. *Id.* § 7, 52 Stat. at 1063–64 (codified as amended at 29 U.S.C. § 207 (1976 & Supp. V 1981)).

6. *Id.* § 12, 52 Stat. at 1067 (codified as amended at 29 U.S.C. § 212 (1976)).

7. *Id.* § 11(c), 52 Stat. at 1066–67 (codified at 29 U.S.C. § 211(c) (1976)).

8. In 1935, New York passed a law prohibiting homework in certain specified industries. 1959 REPORT, *supra,* at 16, *reprinted in* II J.A. 490. By 1942, nine states had passed laws authorizing "prohibition of home work directly or by industry orders. Five states [had] prohibited home work on knitted outerwear entirely or in the manufacture of specific products." 1942 FINDINGS, *supra,* at 13, *reprinted in* I J.A. 79.

9. The 1942 findings included by the parties in the Joint Appendix deals specifically with the knitted outerwear industry. Findings were issued by the Administrator for all seven industries at issue, and both parties to this appeal indicate that these findings contain similar data. Appellees' brief, p. 9 n. 7; Appellants' brief, p. 8 n. 5.

of fifty-six employers revealed that forty-five "were in violation of the record-keeping provisions in one manner or another." *Id.* at 20, I J.A. 86. This study also found that only twelve of the fifty-two employers for whom information was available were violating neither the wage nor the hour provisions of the Act with respect to homeworkers. *Id.* at 22, I J.A. 88. Moreover, the employers violating either the wage or the hour provisions of the Act employed ninety-five percent of the total homeworkers in the study,[10] and employers violating both provisions accounted for more than two-thirds of the total. *Id.* To determine the extent of violations within each firm, the Division interviewed 430 homeworkers. This study revealed that approximately seventy percent of these workers earned less than the minimum wage of thirty-five cents per hour and twenty-three percent earned less than twenty cents per hour. The average wage for homeworkers in the sample group was twenty-seven cents per hour, less than eighty percent of the minimum wage. *Id.* at 23, I J.A. 89.

The Administrator then examined the underlying reasons for the violation rate and concluded that "[t]here are many opportunities for evasion of the minimum wage standards which are inherent in the home work practice." *Id.* at 26, I J.A. 92. One of the impediments to enforcement of minimum wages was the difficulty of ascertaining the identity of homeworkers:

> If the employer chooses to omit names of homework employees from his pay roll, there is almost no effective means of

check-up since the workers may be scattered through the city or the State. Even where the list of names is properly kept, there is no means of ascertaining how many persons in the family may have been actually engaged in the work. The constant change in address of low-income families and the high turnover in home work employees complicate the problem of finding the home worker.

*Id.*

Even when workers could be identified, it was difficult to obtain accurate records of the number of hours each employee had worked, necessarily burdening efforts to ensure compliance with minimum wage, maximum hour, and overtime provisions of the Act. The Administrator found that:

> It is obvious, however, that the employer can have no certain knowledge of the number of hours spent by the home worker. Even with the best of intentions the home worker has many interruptions and is frequently unable to keep an accurate record of hours worked. Fear that work will be withdrawn if the home worker is unable to make the minimum is a strong incentive to falsify records.

*Id.*

Testimony by Division officials also indicated that the foregoing problems made investigation of wage and hour violations vastly more difficult when homeworkers were involved.[11] The Division's Regional Director for Connecticut, New Jersey and New York testified that "an investigation in a home work industry takes anywhere

---

10. The study involved 1,577 homeworkers, a significant percentage of the estimated 6,000 to 8,000 homeworkers employed in the industry at the time. 1942 FINDINGS, *supra,* at 14, 22, *reprinted in* I J.A. 80, 88.

11. The problem involved when inspecting factory conditions contrasted to those problems which confront us when inspecting home work conditions are distinctly different in approach, time consumption and results obtained. The inspector in one or two visits to a factory is able to interview a sufficient number of employees and is also able to check records pertinent to their employment. He can, therefore, substantially determine the scope and seriousness of violations uncov-

ered or compliance on the part of the employer. As against this comparatively simple procedure, home work investigations involve visits to homes of home workers, scattered as they are throughout every part of the City of New York and every part of the region. Frequently our inspectors must make more than one visit for the purpose of interviewing them. Each home worker interviewed constitutes almost as much inspection work as does an entire inspection of a fair sized factory establishment.
1942 FINDINGS, *supra,* at 27, *reprinted in* I J.A. 93 (quoting testimony of Arthur J. White) (footnote omitted).

from two weeks to two months, that is, to be able to get time studies and the information necessary to insure a complete inspection, whereas, the average inspector can complete one or two cases a week of factory inspection." *Id.* at 27, I J.A. 93 (quoting testimony of Arthur J. White).

When violations were discovered, compensating homeworkers was onerous. Complex employer-employee relationships (often involving middlemen) made it "difficult to determine where to place the responsibility for violations" in the industry: "[c]ontractors usually have more than one jobber, necessitating several individual negotiations, and frequently manufacturers disclaim liability for contractors' violations." *Id.* at 29, I J.A. 95. Additionally, the responsible parties were often bankrupt by the time the Division obtained judgment against them. *Id.*

These considerations led the Administrator to conclude that:

> The extensive evidence in the record can leave no doubt of the high incidence of subminimum employment of home workers in the Knitted Outerwear Industry. The record shows that industrial homework furnishes a ready means of circumventing or evading the minimum wage order for this industry, that the existing requirements of the Act have been evaded by these means and that the continuation of home work will endanger the standards of factory employment.

*Id.* at 30–31, I J.A. 96–97.

The Administrator then considered whether violations could be controlled if the Division undertook time studies and fixed piece rates for homework, and concluded that this was not an effective enforcement option. First, because of wide variations in the productivity of individual workers, establishing an average piece rate resulted in "only the roughest kind of approximation of actual individual hours worked." *Id.* at 32, I J.A. 98. This problem was exacerbated by variations in "size of yarn, or closeness or looseness of stitch," *id.* at 33, I J.A. 99 (quoting testimony of Anna L. Hoffer), as well as different combinations of styles, sizes and color. *Id.* at 32, I J.A. 98.[12] Even if a piece rate could be identified, the Administrator found that there was no effective way to use the rate to protect the wage rights of *individual* homeworkers.[13] The record also indicated that employers would still have "many ways of reducing the earnings of the home worker, even if you do pay her the prescribed piece work rate." *Id.* at 32, I J.A. 98 (quoting testimony of Julius Traugot). Hence, the Administrator concluded that "effective enforcement of the minimum wage order for the Knitted Outerwear Industry cannot be expected with respect to industrial home workers by the piece-rate method and that prohibition is required." *Id.* at 34, I J.A. 100.

The Administrator soon acted on the information contained in the Division reports and prohibited homework in the seven industries studied, unless homeworkers came within certain narrow exceptions. The regulation applicable to the knitted outerwear

**12.** The extent of this problem was witnessed under the National Industrial Recovery Act, Pub.L. No. 73–67, 48 Stat. 195 (1933) (codified at 15 U.S.C. §§ 701–712 (1934)), *held unconstitutional in Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). "The N.R.A. code for the industry lasted one year and 5 months but during this entire period efforts to establish minimum piece rates for home work were unsuccessful." 1942 FINDINGS, *supra*, at 18, *reprinted in* I J.A. 84.

**13.** The Act does not authorize the payment of a piece rate which is "commensurate" with applicable minimum hourly rates. Consequently, no average rate or piece rate adjusted with a percentage allowance can be considered a proper rate of compensation unless make-up is paid to the worker who does not earn the hourly minimum. Such make-up pay can be calculated only on the basis of records of hours worked and, as has been seen, such information cannot be obtained. It would, therefore, be necessary either to adopt the alternative of setting the piece rate at the level of the home worker of the least productivity which is not feasible from the business standpoint, or to adopt the equally unfeasible alternative from an administrative standpoint of setting individual piece rates for each home worker in each of the numerous operations to which he may be assigned. *Id.* at 32, I J.A. 98 (footnote omitted).

industry authorized the issuance of special homework certificates to workers who were unable to adjust to factory work because of physical or mental disability, or were unable to leave home because their presence was required to care for an invalid in the home.

The authority of the Administrator to take such action was upheld in *Gemsco, Inc. v. Walling,* 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945),[14] and this authority was explicitly conferred by act of Congress in 1949. In amending the Act, Congress provided that:

> The Administrator is authorized to make such regulations and orders regulating, restricting, or prohibiting industrial homework as are necessary or appropriate to prevent the circumvention or evasion of and to safeguard the minimum wage rate prescribed in this Act, and all existing regulations or orders of the Administrator relating to industrial homework are hereby continued in full force and effect.

Fair Labor Standards Amendments of 1949, Pub.L. No. 81–393, § 9, 63 Stat. 910, 916–17 (1949) (codified at 29 U.S.C. § 211(d) (1976)). With the Division's authority to restrict homework thus firmly established, the Division adhered to this method of controlling homework abuses until the Secretary's decision in 1981.[15]

### B. *The Secretary's Action*

On December 5, 1980, the Division published a notice of hearings to obtain information on the situation with respect to in- dustrial homework and the extent to which it might bear "on the Secretary's statutory responsibility 'to prevent the circumvention or evasion of and to safeguard the minimum wage rate prescribed' in the Fair Labor Standards Act." 45 Fed.Reg. 80,555 (1980). Hearings were subsequently held in Burlington, Vermont and Washington, D.C. At the hearings, opposition to the restrictions on homework came almost entirely from homeknitters (and their representatives) from Vermont, and government officials from Vermont.

On May 5, 1981, the Division published a notice proposing removal of the restrictions on homework in the seven industries. 46 Fed.Reg. 25,108 (1981). The Department indicated that its "primary concern is the protection of workers from the illegal payment of subminimum wages," and requested additional information on the effects of its proposal on the Act's minimum wage provisions, the seven currently restricted industries and small businesses. *Id.* at 25,-109.

Following receipt and consideration of more than 10,000 comments, the Secretary "decided to remove the restrictions on the employment of homeworkers in the knitted outerwear industry and to retain such restrictions in the remaining six industries." 46 Fed.Reg. 50,348 (1981). This decision was based primarily on the finding that "substantial curtailment of employment opportunities and earning power will result from a continuation of the restrictions on industrial homework in the knitted outer-

---

14. In reviewing a petitioner's challenge to restrictions in the embroidery industry, the Court said:

> [I]f the prohibition [*i.e.,* restrictions] cannot be made, the floor for the entire industry falls and the right of the homeworkers and the employers to be free from the prohibition destroys the right of the much larger number of factory workers to receive the minimum wage. This is true not merely as a matter of inference from evidence having only prospective and predictive value. It is proved conclusively by the Administrator's experience in attempting by regulatory methods to secure compliance with the previously prevailing lower "committee" rate. His experience is borne out by that of state and federal

authorities prior to the Fair Labor Standards Act. Attempts to maintain minimum wages by regulating homework have failed generally of their purpose. This failure, after fair trial, is responsible for the Administrator's resort to prohibition in the present order.

324 U.S. at 252–54, 65 S.Ct. at 611–12 (footnotes omitted). The Court found that in light of the Administrator's findings, restriction was within his statutory authority both "by necessity to avoid self-nullification and by its explicit terms." 324 U.S. at 255, 65 S.Ct. at 612.

15. In 1959, prohibitions were removed from the manufacture of hand fashioned jewelry on certain Indian reservations. 29 C.F.R. § 530.12(b) (1960).

wear industry. No such demonstration was made with regard to industrial homework in the other six industries [and consequently] it appears reasonable to remove the restrictions in the knitted outerwear industry only." *Id.* at 50,349.

The Secretary indicated that in conjunction with the removal of the restrictions the Department would undertake "a concerted compliance effort in this industry." The Secretary suggested that such an effort could be effective:

> Since it appears that homeworkers will comprise only a small percentage of the approximately 63,000 production employees in this industry, an effective enforcement program is feasible. When the restrictions were established in knitted outerwear, almost 40 years ago, effective oversight of homework in this industry was not possible as it was estimated that homeworkers constituted more than 20 percent of the workforce, the enforcement program of the Department was newly established, and acceptance of the principle of a minimum wage among covered employers was much less prevalent than at present.

*Id.*

On October 27, 1981, the appellants brought an action, pursuant to section 10(b) of the APA, 5 U.S.C. § 703 (1982), to enjoin the Secretary's rescission of the restrictions on homework in the knitted outerwear industry. The appellants alleged that the Secretary's decision to rescind exceeded his statutory authority under section 11(d) of the Fair Labor Standards Act of 1938, 29 U.S.C. § 211(d) (1976), was arbitrary and capricious within the meaning of section 10(e) of the APA, 5 U.S.C. § 706(2)(A) (1982), and was not accompanied by an adequate statement of basis and purpose as required by section 4(b) of the APA. 5 U.S.C. § 553(c) (1982).

While the District Court held that the appellants did have standing to sue, it re-

jected their challenges to the rescission. The court found that the appellants' argument concerning the alleged limitations of the Secretary's statutory authority was not supported by the language or history of section 11(d), *International Ladies' Garment Workers' Union v. Donovan*, Civ. No. 81–2606, mem.op. at 6 (D.D.C. July 23, 1982), *reprinted in* II J.A. 608, and the appellants do not raise this argument on appeal. The court then indicated that in deciding whether the rescission was arbitrary and capricious, the court should review the rescission with "extreme deference." The court reasoned that because the determination of how the minimum wage law can best be enforced is "within the special competence of the Executive Branch," this determination should be set aside "only if there is virtually no evidence to support it." *Id.* at 9, II J.A. 611. Finding that the Secretary had satisfied this minimal standard, the District Court upheld his decision.

## II. Standing and Cause of Action

The appellants have brought this action primarily to redress injuries resulting from payment of subminimum wages by homeworker employers. They allege that this unfair competition will injure factory employers by causing them to lose markets and profits. Factory employees, in turn, will be injured because their employers will be forced to reduce wages and lay off workers.

The appellees argue that as a threshold matter the appellants have neither a cause of action nor standing to sue. Both arguments are largely based on the same premise: sections 16 and 17 of the Act, 29 U.S.C. §§ 216, 217 (1976 & Supp. V 1981), lay "out a distinct and detailed statutory mechanism for judicial enforcement of [the Act] specifically by employees who are themselves denied the minimum wage, or by the Secretary on behalf of such employees." Appellees' brief, p. 34.[16] The appel-

---

**16.** The pertinent language of § 16 provides:
(b) Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees

affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated dam-

lees argue that this statutory mechanism was intended to be exclusive, and hence forecloses judicial review of agency action under the APA. In the appellees' view, it also means that the appellants are not "within the zone of interests" protected by the Fair Labor Standards Act and consequently do not have standing to sue under the APA.

■ Initially, we must consider the appellants' contentions that the appellees are foreclosed from raising the cause of action argument by their failure to raise it below, and from raising both the cause of action and standing arguments by their failure to file a cross appeal. *See Wisconsin Bankers Association v. Robertson,* 294 F.2d 714 (D.C. Cir.), *cert. denied,* 368 U.S. 938, 82 S.Ct. 381, 7 L.Ed.2d 338 (1961). Because "the question of standing goes to this court's jurisdiction, we must decide the issue" in spite of the waiver arguments raised by the appellants. *Southern Mutual Help Association v. Califano,* 574 F.2d 518, 522 (D.C.Cir.1977). *See generally Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982) (because subject-matter jurisdiction is an Article III requirement, a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings; additionally, "a court, including an appellate court, will raise lack of subject-matter jurisdiction on its own motion").

■ The issue of whether a complaint has properly stated a Federal cause of action is generally viewed as going to the merits, but it may be dismissed on jurisdictional grounds where the Federal action "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). While we think it clear that the appellants' assertion of a cause of action is neither wholly insubstantial nor frivolous and consequently we could reject the appellees' cause of action argument because of their failure to raise it below, *cf. Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 279, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) (where plaintiff's allegation that his rights were violated and he was entitled to relief was "not so patently without merit as to fail the test of *Bell v. Hood* ... the question as to whether the respondent stated a claim for relief under § 1331 is not of the jurisdictional sort which the Court raises on its own motion"), we will address the appellees' argument to resolve any jurisdictional uncertainties. *See Regents of the University of California v. Bakke,* 438 U.S. 265, 380, 98 S.Ct. 2733, 2794, 57 L.Ed.2d 750 (1978) (White, J., concurring) ("if we are not obliged to [consider whether a private cause of action exists], it is at least advisable to address this threshold jurisdictional issue"). *Cf. Morris v. Washington Metropolitan Area Transit Au-*

---

ages. Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed

in the court in which such action is brought....

(c) ... The Secretary may bring an action in any court of competent jurisdiction to recover the amount of unpaid minimum wages or overtime compensation and an equal amount as liquidated damages.

29 U.S.C. § 216(b), (c) (Supp. V 1981). The pertinent language of § 17 provides:

The district courts ... shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title, including in the case of violations of section 215(a)(2) of this title the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees ....

29 U.S.C. § 217 (1976).

*thority,* 702 F.2d 1037, 1040–42 (D.C.Cir. 1983) (raising *sua sponte* doubts about existence of direct remedy under Constitution and, while remanding on other grounds, directing the district court to permit parties to amend pleadings to address this issue).

■ The appellants argue that they have stated a valid cause of action and are entitled to judicial review under section 10(a) of the APA, 5 U.S.C. § 702 (1982), which provides that "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Despite the apparent force of the appellants' position, the appellees contend that this right to review of the Secretary's action is foreclosed in this case by section 10 of the APA, which prevents courts from reviewing actions under the APA where "statutes preclude judicial review." 5 U.S.C. § 701(a)(1) (1982).

We find the appellees' contentions to be wholly unpersuasive. The burden on the appellees in advancing an argument against judicial review is a heavy one, and we conclude that they have completely failed to satisfy that burden. "The legislative material elucidating that seminal act [the APA] manifests a congressional intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967) (quoting *Shaughnessy v. Pedreiro,* 349 U.S. 48, 51, 75 S.Ct. 591, 594, 99 L.Ed. 868 (1955)) (footnote omitted). We have indicated that under the APA there is "a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate." *NRDC, Inc. v. SEC,* 606 F.2d 1031, 1043 (D.C.Cir.1979). *Accord Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975) (absent express statutory prohibition of review, the Secretary bears a "heavy burden of overcoming

the strong presumption that Congress did not mean to prohibit all judicial review of his decision"); *Abbott Laboratories,* 387 U.S. at 140, 87 S.Ct. at 1511 ("judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress"); *Rusk v. Cort,* 369 U.S. 367, 379–80, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962) (requiring "clear or convincing" evidence of congressional intent to make "broadly remedial provisions" of the APA unavailable to review acts under the Immigration and Nationality Act).

■ The appellees do not suggest that any statute explicitly precludes review of the Secretary's decision, but argue that preclusion should be *implied* from the Act's provision for actions by underpaid employees, or the Secretary, to recover unpaid wages. The suggestion that provision of such an action evidences a clear and convincing intent to exclude all other judicial relief, and in particular the right of aggrieved parties to challenge allegedly arbitrary and capricious actions by the Secretary, borders on the incredible. As we recently indicated, in rejecting a very similar argument, "[a] private right of action . . . is addressed to suits by private litigants *against private parties* allegedly acting in violation of a statutory command. The instant action, seeking judicial redress of alleged *administrative* misconduct, is a distinct form of proceeding . . . ." *Common Cause v. Department of Energy,* 702 F.2d 245, 249 n. 30 (D.C.Cir.1983) (citations omitted). *See also Abbott Laboratories,* 387 U.S. at 141 (quoting L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 357 (1965)) (" 'The mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right of review is too important to be excluded on such slender and indeterminate evidence of legislative intent.' ").

■ Moreover, rather than providing proof of an intent to restrict review, an analysis of the language and history of the Act compels allowance of the review sought in this case. The language and history un-

mistakably evidence an intent to protect all covered employees and employers from the economic consequences of subminimum wages paid to a small sector of the labor force. Section 2(a) of the Act, indicates that

[t]he Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; . . . [and] (3) constitutes an unfair method of competition in commerce.

29 U.S.C. § 202(a) (1976). Similarly, the House Report argued that following passage of the Act

[n]o employer in any part of the United States in any industry affecting interstate commerce need fear that he will be required by law to observe wage and hour standards higher than those applicable to his competitors. No employee . . . need fear that the fair labor standards maintained by his employer will be jeopardized by oppressive labor standards maintained by those with whom his employer competes.

H.R.REP. No. 2182, 75th Cong., 3d Sess. 6–7 (1938). See also Lerwill v. Inflight Services, Inc., 379 F.Supp. 690, 696 (N.D.Cal. 1974) ("The Act serves a public and a private purpose. Its enforcement provisions are intended to protect workers and their families, whom the Act is intended to benefit, see 29 U.S.C. § 202 (1976), but it is also intended to protect the employers who comply with its terms."), aff'd sub nom. Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507 (9th Cir.1978).

This concern was reiterated by Congress in the Fair Labor Standards Amendments of 1961.[17] Congress amended sections 16(b) and 17 of the Act to permit the Secretary to commence actions seeking payment of back wages due to employees because of minimum wage and overtime violations, even absent a request for such action by employees. Section 12, 75 Stat. 65, 74–75 (1961) (codified as amended at 29 U.S.C. §§ 216(b), 217 (1976 & Supp. V 1981)). See H.R.REP. No. 75, 87th Cong., 1st Sess. 28 (1961). The House Report explained the need for this change:

Under the present provisions of the act, the Secretary of Labor has no authority to require the payment of minimum wages and overtime compensation not paid in compliance with the law, except where an employee requests that an action be brought by the Secretary of Labor. This limitation has impeded the Secretary in his efforts to enforce the act since many employees who have not been paid in compliance with the act are hesitant about requesting legal action against their employers.

Id. at 27–28. The Report argues that the amendments "would increase the level of compliance with the statute, and would protect complying employers from the unfair wage competition of the noncomplying employers."[18]

■ The legislative history also suggests that the protection sought for all covered employers and employees will be jeopardized unless those parties are entitled to judicial review of the Secretary's actions. First, there may be occasions when the interests of underpaid employees are such that they cannot be expected to bring actions which will, in effect, protect employers complying with the Act and their em-

---

17. Pub.L. No. 87–30, 75 Stat. 65 (1961) (codified as amended in scattered sections of 29 U.S.C. §§ 201–219 (1976 & Supp. V 1981)).

18. Id. at 28 (emphasis added). See Hodgson v. YB Quezada, 498 F.2d 5, 6 (9th Cir.1974) ("[T]he restraint embodied in Section 17 serves at least two important purposes: it serves to increase the effectiveness of the Act by depriving a violator of any gains resulting from his violation, and it protects those employers who comply with the Act from unfair competition by those who do not comply."); Wirtz v. Malthor, Inc., 391 F.2d 1, 3 (9th Cir.1968) (same).

ployees.[19] The 1961 amendments make it clear that protection of the latter parties' interests does not depend on private actions by underpaid employees; the Secretary may bring actions to enforce the Act even absent the consent of the underpaid employees. Second, the Act reflects a recognition of the limitations of actions for back wages as a means of assuring compliance with the Act. This is evidenced by section 11(d), which authorizes the Secretary to regulate, and if necessary prohibit, homework. 29 U.S.C. § 211(d) (1976). Hence, it is apparent that effective protection of the interests of complying employers and their employees significantly depends on reasonable actions by the Secretary. We therefore conclude that permitting the appellants to seek judicial review to insure that such actions are not arbitrary and capricious is entirely consistent with the language, history and purposes of the Act.[20]

The foregoing discussion permits us to dispose quickly of the challenges to the appellants' standing to sue. The crux of the appellees' position is that the appellants do not fall within the "zone of interests" protected by the Act. *See generally Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). We have indicated that in applying the zone of interests test we "must discern whether the interest asserted by a party in the particular instance is one intended by Congress to be protected or regulated by the statute under which suit is brought." *Control Data Corp. v. Baldrige*, 655 F.2d 283, 293–94 (D.C.Cir.) (footnote omitted), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981).[21] Additionally, " 'slight' beneficial indicia will be sufficient to sustain a party's assertion of standing." *Id.* at 295. The earlier discussion in this section reveals that there are clear indicia that compliant employers and their employees are within the zone of interests protected by the Fair Labor Standards Act. Consequently such par-

**19.** In some circumstances, this will be because the underpaid workers are not in a position to sue for back wages, even though they might like to do so. *See* H.R.Rep. No. 75, 87th Cong., 1st Sess. 28 (1961) (employees may be hesitant about requesting legal action against their employers). In other circumstances, the interests of underpaid employees and complying employers (and their employees) may be in conflict. Such would be the case if the underpaid employees feared retaliation (or serious economic consequences for their employer, which might ultimately have adverse consequences for the employees) resulting from any action (including one brought by the Secretary) against their employer, and yet the 1961 amendments do authorize such an action. The appellees argue that the instant case also involves conflicting interests, because restrictions on homework will "bar the homeknitters' very livelihood." Appellees' brief, p. 38 n. 20. Nevertheless, there is no question that the Secretary does have the authority to impose such restrictions. *See* 29 ·U.S.C. § 211(d) (1976). Hence, it is evident that the Act does authorize the Secretary to take action that may be contrary to the perceived interests of some underpaid employees. Indeed, in at least some respects, minimum wage laws are inherently contrary to the interests of those underpaid employees who may not be employable at all at the minimum wage.

We do not mean to suggest that Congress was not primarily concerned with the well-being of underpaid employees. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n. 18, 65 S.Ct. 895, 902 n. 18, 89 L.Ed. 1296 (1945). Our point is that this was not the sole congressional concern, and that it is clear from the Act that there may be times when the Secretary should take certain actions to enforce the Act despite the protestations of some underpaid employees.

**20.** It is also clear that this protection cannot be provided by simply permitting underpaid employees to seek review of the Secretary's actions. *See* note 19 *supra*. Furthermore, it is very questionable whether the appellees' position would even permit underpaid employees—in this case homeworkers—to challenge the Secretary's actions, since the Act has already provided a "distinct and detailed statutory mechanism" for enforcement of their rights. Appellees' brief, p. 34. Moreover, homeworkers who are not working because of restrictions might be in a particularly weak position to assert a right to review because they can hardly be considered to be members of the class of underpaid employees. The hardship such parties might have to endure further illustrates the folly of the appellees' attempt to insulate the Secretary's action from the safeguards provided by the APA.

**21.** For a recent discussion of this test, see *American Friends Service Comm. v. Webster*, 720 F.2d 29 at 49–57 (D.C.Cir.1983).

ties are persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702 (1982), and (assuming they meet the other tests for standing) have standing to sue under the APA. *Sierra Club v. Morton,* 405 U.S. 727, 732–33, 92 S.Ct. 1361, 1364–65, 31 L.Ed.2d 636 (1972); *Barlow v. Collins,* 397 U.S. 159, 164–65, 90 S.Ct. 832, 836, 25 L.Ed.2d 192 (1970); *Association of Data Processing Service Organizations,* 397 U.S. at 153–57, 90 S.Ct. at 829–31 (1970). Hence, we reject the suggestion that the manufacturers, manufacturers' associations and labor organizations [22] do not satisfy the zone of interests test in this case.[23]

▮▮▮ The appellees also suggest in a footnote that the relief sought by the appellants—reimposition of restrictions—will not redress the injuries they claim. Appellees' brief, pp. 38–39 n. 21. It is well-established that to have standing a party must allege an injury that " 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976)).[24] The appellees argue that to satisfy this standard, the appellants must show that if restrictions are reimposed, employers of homeknitters will employ factory labor. This position reflects a serious misunderstanding of the nature of the appellants' alleged injuries. The appellants allege that unfair competition (*i.e.,* payment of subminimum wages) from homeworker employers will injure factory employers paying lawful wages and the resulting pressures to lay off workers and reduce wages will injure factory employees. We must accept these allegations as true for purposes of determining standing. *See Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975). The alleged injuries can be redressed by controlling the source of the unfair competition (*i.e.,* restricting employment of homeworkers); in other words, whether homeworker employers thereafter decide to employ factory workers simply has no relevance to the appellants' claims. *Cf. Simon,* 426 U.S. at 45 n. 25, 96 S.Ct. at 1927 n. 25 ("The complaint in *Data Processing* alleged injury that was directly traceable to the action of the defendant federal official, for it complained of injurious competition that would have been illegal without that action.").

Alternatively, the appellees' argument can be read to suggest that injurious com-

**22.** The appellees do not, and could not reasonably, claim that the fact that manufacturers' associations and labor organizations are suing in a representative capacity presents additional complications in this case. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977) ("Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").

**23.** The appellees have also suggested that where the plaintiffs' interests diverge from the interests of those whom a statute is designed to protect, the plaintiffs have no standing to sue. The appellees read our decisions in *Cooper & Brass Fabricators Council, Inc. v. Department of the Treasury,* 679 F.2d 951 (D.C.Cir.1982), and *Control Data Corp.,* 655 F.2d 283, too

broadly. In both of these cases, we explained that there was *no* evidence indicating an intent in the pertinent statutes to protect or benefit the plaintiffs and that the protection sought by the plaintiffs was inconsistent with the purposes of these statutes. 679 F.2d at 953; 655 F.2d at 295. In contrast, it is clear that the Fair Labor Standards Act was intended to protect compliant employers and their employees as well as underpaid employees. Efforts to insure that any competing interests of these parties are resolved by the Secretary in a rational manner, and that the Act is rationally enforced, are certainly consistent with this statutory intent.

**24.** *Accord Bryant v. Yellen,* 447 U.S. 352, 368, 100 S.Ct. 2232, 2241, 65 L.Ed.2d 184 (1980) (finding standing where it was "likely" that relief requested by plaintiffs would result in benefit they hoped for); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (plaintiffs' injury must be "likely to be redressed if the requested relief is granted"); *Safir v. Dole,* 718 F.2d 475 at 479 (D.C.Cir.1983) (same).

petition will continue if restrictions are re-imposed because homework employers will either hire homeworkers illegally or will move their operation abroad and compete by using lower-priced foreign labor.[25] This claim is substantially different than those on which the Supreme Court relied in the cases cited by the appellees—*Warth* and *Simon.* In *Warth,* the Court found that low and moderate income individuals seeking housing did not have standing to challenge exclusionary zoning practices, in part because redress of their injury "depended on the efforts and willingness of third parties to build low- and moderate-cost housing." 422 U.S. at 505, 95 S.Ct. at 2208. Similarly, the relief sought by the plaintiffs in *Simon* (denial of favorable tax treatment to hospitals that did not serve indigents) would only encourage third parties to provide the hospital treatment desired by the appellants; whether third parties would provide this treatment was "speculative at best." 426 U.S. at 43, 96 S.Ct. at 1926 (footnote omit-ted). In contrast, the relief sought by appellants would make the injurious conduct of third parties complained of in this case illegal; only by taking extraordinary measures—*i.e.,* violating the law or starting new businesses overseas—could third parties prevent redress of the appellants' injuries.[26]

The appellants need not negate every conceivable impediment to effective relief no matter how speculative, *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 78, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978), nor are they required "to *prove* that granting the requested relief is *certain* to alleviate" their injury. *Community Nutrition Institute v. Block,* 698 F.2d 1239, 1248 (D.C.Cir.1983). *See also Bryant v. Yellen,* 447 U.S. 352, 367–68, 100 S.Ct. 2232, 2240–41, 65 L.Ed.2d 184 (1980).[27] The speculation offered by the appellees is not supported by sound reasoning or the record.[28] Also, as Con-

25. Appellees' brief, p. 39 n. 20. The appellees make these allegations about the likely actions of homework employers as evidence of their claim that these employers will not hire factory workers. The appellees' failure to argue explicitly that the competition resulting from such actions will approach that resulting from rescission of restrictions, gives cause to wonder whether even the appellees think this is a serious possibility. It is also noteworthy that the Secretary did not suggest this possibility in justifying rescission of the restrictions.

26. *See American Society of Travel Agents, Inc. v. Blumenthal,* 566 F.2d 145, 151 (D.C.Cir.1977) ("Here, the AJC and other such groups will clearly remain free to pursue their travel businesses, however the tax status is finally resolved. By contrast, in [*Association of Data Processing Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ], if the Comptroller of the Currency's ruling had been overturned on judicial review, the offering of data processing services by national banks would have been *illegal,* and petitioners undoubtedly would have faced no further competition from that source, absent statutory revision."), *cert. denied,* 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978).

27. In *Community Nutrition Institute* we also explained that
litigation often "present[s] complex interrelationships between private and government activity that make difficult absolute proof that the harm will be removed." Thus, a

court should be careful not to require too much from a plaintiff attempting to show redressability, lest it abdicate its responsibility of granting relief to those injured by illegal governmental action.
698 F.2d at 1248 (quoting Nichol, *Causation as a Standing Requirement: The Unprincipled Use of Judicial Restraint,* 69 KY.L.J. 185, 215 (1980–81)). We are also wary of requiring too strong a showing by the appellants in a case such as this where—as the appellees repeatedly point out—some uncertainties are inevitable.
Furthermore, even if reimposition of restrictions would only significantly—rather than completely—redress the appellants' injuries, this would be sufficient to permit judicial review. Nichol, *supra,* at 222 ("*standing should be granted if a favorable decision would contribute in any significant manner to remedying or preventing the plaintiff's injury.*") (footnote omitted). This is certainly consistent with the desire underlying the redressability requirement "to limit the judicial role to measures that will produce tangible, meaningful results in the real world." *Common Cause,* 702 F.2d at 254.

28. As we discuss in greater detail *infra,* restrictions on homework in 1942 were followed by a reduction in homeworkers from approximately 30% to 1.6% of all knitted outerwear employees, and the appellees appear to acknowledge some causal relationship between the restrictions and the reduction.
The suggestion that homeworker employers will move abroad is only supported by the

gress passed the Act partly to provide redress to employers from unfair competition, the suggestion that effective enforcement of the Act will not have this effect directly contravenes the congressional judgment underlying the Act.

In short, Congress intended to afford protection to both the employers and employees who are represented in this lawsuit. There is no reason in the present case for the appellants to be denied judicial review to assure that this intent is reasonably being effectuated.[29]

## III. Discussion

### A. Scope of Review

Both parties agree that the rescission was informal, notice-and-comment rulemaking conducted pursuant to section 4 of the APA, 5 U.S.C. § 553 (1982), and as such is to be found unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (1982). *See, e.g., Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 2865, 77 L.Ed.2d 443 (1983); *Office of Communications of United Church of Christ v. FCC,* 707 F.2d 1413, 1422 (D.C.Cir.1983). However, the parties vigorously dispute the rigor with which this test should be applied when a court reviews an agency's rescission of longstanding policy.

This case is a classic example of an agency attempt to modify a longstanding policy by rescinding regulations embodying that policy. In our view, whatever questions may have existed with respect to the proper standard of judicial review of such actions were put to rest last term when the Supreme Court decided *Motor Vehicle Manufacturers Association.* In that case, involving rescission by the National Highway Traffic Safety Administration (hereinafter "NHTSA") of a regulation requiring installation of passive restraints in motor vehicles produced after 1982, the Court rejected the suggestion that rescission was analogous to agency inaction, which is judged by an unusually narrow standard of review. The Court indicated that "revocation of an extant regulation is substantially different than a failure to act," 103 S.Ct. at 2866, reasoning that

[r]evocation constitutes a reversal of the agency's former views as to the proper course. A "settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to." *Atchison, T. & S.F.R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807–808, 93 S.Ct. 2367, 2374–2375, 37 L.Ed.2d 350 (1973).

*Id.*

■■■■ While the Court recognized that an agency must be given latitude to adapt

---

testimony of one homeworker employer, arguing against domestic restrictions on his business. Of course this does not even suggest that production of knitted outerwear comparable in quantity to that resulting from removal of homework restrictions will shift overseas, or that such overseas employers will be able to compete as effectively in United States' markets as they would if operating within the United States as homework employers. Moreover, other evidence cited by the appellees—testimony by a homework employer that if restrictions are resumed he would cease business altogether—directly supports the conclusion that restrictions would reduce the unfair competition of which the appellants complain. The risk of employers moving abroad also seems minimal when one considers that the appellants are only

seeking reimposition of the status quo (as it existed prior to 1981). The record does not indicate that knitted outerwear businesses moved overseas in large numbers during the forty years that homework was restricted and one would not expect—absent persuasive evidence in the record—that a reimposition of these restrictions after only a two-year hiatus would suddenly lead to a substantial exodus of domestic businesses.

**29.** Because we decide that the manufacturers, manufacturers' associations and labor organizations have standing, we need not decide the standing of other appellants in this action. *Watt v. Energy Action Int'l Found.,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981).

its rules to accommodate changing circumstances, it noted that these changes "do not always or necessarily point in the direction of deregulation." *Id.* "In the abstract, there is no more reason to presume" that such changes require "rescission of prior action, instead of a revision in or even the extension of current regulation." *Id.* Hence, the Court concluded that if there is "a presumption from which judicial review should start, that presumption—contrary to petitioners' views—is not *against* safety regulations, but *against* changes in current policy that are not justified by the rulemaking record." *Id.* In other words, the standard of judicial review is *not* altered by the fact that the agency has rescinded a regulation, rather than moved in some other direction. *Id.*

We find the Court's reasoning particularly compelling as applied to the case at hand, since this case involves review of an agency's rescission of a longstanding policy.[30] The Division's decision in 1942 to restrict homework was an outgrowth of many years of unsuccessful attempts by state and Federal officials to regulate homework. These officials, and commissions reviewing their efforts, concluded that even the most vigorous enforcement efforts could not prevent violations of labor standards when homeworkers are used. The Division's comprehensive review of this experience led it to conclude that restricting homework was the only effective way to enforce the minimum wage in the knitted outerwear industry, and this position was adhered to by the Division for almost forty years. This settled course of behavior truly embodied the Division's informed judgment that restricting homework would best carry out the policy dictated by Congress.

The appellees' suggestion that the restrictions on homework were not seriously reexamined for forty years and that this should narrow our review of the rescission of the restrictions is untenable. As we have explained, the relative efficacy of regulation and restriction received substantial attention for many years prior to adoption of the homework restrictions, and was exhaustively studied by the Division in 1942. The Division also studied violations of the Act by employers of homeworkers in 1959, to obtain information "to aid development of a more effective enforcement program." 1959 REPORT, *supra*, at 1, *reprinted in* II J.A. 475.

The Division's adherence to the restrictions between 1942 and 1980 is a reflection of the widespread and persisting decision that restriction of homework was a prerequisite to effective enforcement of the Act. This support for the restrictions is evidenced by comments received from five Secretaries of Labor, serving a number of administrations between 1960 and 1981, and from the Administrator of the Division from 1958 to 1969, voicing strong opposition to the proposed rescission and arguing that the need for restriction of homework is just as compelling today as it was in 1942.[31]

This consistent support for the restrictions is a sharp contrast to the situation reviewed by the Supreme Court in *Motor Vehicle Manufacturers Association.* There, the Court reviewed the rescission of a regulation which, over the course of its "complex and convoluted history," had been "im-

---

**30.** The regulation at issue here was in effect for almost forty years. In contrast, the regulation involved in *Motor Vehicle Mfrs. Ass'n* had been promulgated four years prior to its rescission and had not actually taken effect (since the requirement only applied to future car models).

**31.** *See* Secretaries' Comments, *supra* note 1, *reprinted in* I J.A. 172–77; Comments of Clarence Lundquist (June 18, 1981), *reprinted in* I J.A. 252–53. The persisting views of the Department were evident in a 1967 publication on labor laws:

> Homework defied regulation, and therefore poor working conditions and poor health standards have continued to flourish wherever homework itself was continued. No corps of inspectors has ever been or could be sufficiently large to inspect all the homes often enough to prevent widespread violation of child labor, minimum wage, or maximum hour standards, or to enforce safety and health provisions.

> U.S. DEP'T OF LABOR, GROWTH OF LABOR LAW IN THE UNITED STATES 266 (1967), *quoted in* ILGWU Comments, *supra*, at 38, *reprinted in* II J.A. 336 (footnote omitted).

**814**

posed, amended, rescinded, reimposed, and now rescinded again." 103 S.Ct. at 2862. We cannot discern any rational basis for being less circumspect in reviewing the rescission of a regulation that has been uniformly supported since its adoption forty years ago, than the Supreme Court was in reviewing rescission of a highly controversial regulation.

Consequently, the normal standard of review, as articulated by the Supreme Court in *Motor Vehicle Manufacturers Association,* is applicable to this case. This review is focused and restricted, and it does not permit us to substitute our judgment for that of the agency.[32] 103 S.Ct. at 2866. "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 2866–67 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). We must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (quoting *Citizens to Preserve*

*Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). An agency's decision will normally be found arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Association,* 103 S.Ct. at 2867.

Moreover, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 2870. Hence, this court may not supply a basis for the agency's action, *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), or accept "appellate counsel's *post hoc* rationalizations for agency action." *Motor Vehicle Manufacturers Association,* 103 S.Ct. at 2870. However, we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation Inc.,* 419 U.S. at 286, 95 S.Ct. at 442.[33]

---

**32.** Our recent decision in *Building & Construction Trades' Dep't v. Donovan,* 712 F.2d 611 (D.C.Cir.1983), surely cannot be read (as the appellees appear to claim) to suggest a contrary rule. There, we were considering a party's claim that longstanding regulations promulgated pursuant to certain statutory language constituted a binding statutory construction by the agency. We held that while longstanding practice can be persuasive evidence when the interpretation of statutory language is involved, it carries much less weight when the statute affords agency discretion and the agency is merely choosing one of several reasonable ways to exercise its discretion. Unlike *Building & Construction Trades' Dep't,* the instant case does not involve a claim that the applicable statute precludes rescission of longstanding policy; instead, the issue is whether the rescission was "arbitrary and capricious." In any event, we need not even ponder the meaning of *Building & Construction Trades' Dep't.* As we have explained, our analysis of the issue in this case is strictly dictated by the Court's approach in *Motor Vehicle Mfrs. Ass'n.*

**33.** The appellees argue that a more deferential standard of review is required by the "experimental" nature of the rescission, and the fact that the rescission is based in part on a predictive judgment about the Secretary's enforcement capacity and the likely responses of employers and employees to alternative enforcement strategies. The latter argument, at most, counsels deference to the predictions made by the Secretary—it does not affect our review of aspects of reasoned decision-making that are unrelated to these predictions. Hence, we consider this argument *infra* in the more limited context in which it is relevant.

The "experimental" argument we can dispose of forthwith. First, the Secretary's expression of a willingness to modify the rescission if new information suggests that this is appropriate, 46 Fed.Reg. 50,349 (1981), hardly counsels any alteration in the standard of review. Agencies remain free to react to new information as part of their standard regulatory procedure, but their expressed willingness to do so certainly cannot insulate their decisions from meaningful judicial review. Unlike the

In short, our review of the Secretary's decision is not merely perfunctory. We are to engage in a "searching and careful" inquiry,[34] the keystone of which is to ensure that the Secretary engaged in reasoned decisionmaking. *American Public Gas Association v. FPC,* 567 F.2d 1016, 1029–30 (D.C. Cir.1977), *cert. denied,* 435 U.S. 907, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978). *See also Motor Vehicle Manufacturers Association,* 103 S.Ct. at 2871 (indicating that agency's explanation "is *not* sufficient to enable us to conclude that the rescission was the product of reasoned decisionmaking"); *Specialty Equipment Market Association v. Ruckelshaus,* 720 F.2d 124 at 132 (D.C.Cir.1983) (when reviewing agency's determinations under "arbitrary and capricious" standard, "we must make a substantial and searching inquiry to ensure that the agency's decisions are the product of reasoned thought and based upon a consideration of relevant factors").

## B. *Failure to Consider Alternatives*

The record before this court makes it clear that the Secretary failed to provide any explanation for his implicit rejection of alternatives to elimination of restrictions on homework. Therefore, in light of *Motor Vehicle Manufacturers Associa-*

*tion,* we are constrained to hold that the Secretary's failure to consider such alternatives, and to explain why such alternatives were not chosen,[35] was arbitrary and capricious, in violation of section 10(e) of the APA, 5 U.S.C. § 706(2)(A) (1982).

There is little dispute about the availability of less far-reaching choices than complete rescission of homework restrictions in the knitted outerwear industry. Indeed, two possible choices were identified in the Department's notice of the Vermont and Washington, D.C. hearings. In that notice the Secretary requested information on "[w]hether the certificate requirements should be revised to recognize additional circumstances justifying certification, such as child care and other family demands that may tend to preclude factory employment," and "[w]hether the certificate requirements should differentiate between urban and rural areas." 45 Fed.Reg. 80,556 (1980).

During the hearings, and in the comments received later, there was substantial testimony which could have led the Secretary to opt for such modifications of the existing restrictions, rather than complete rescission. In fact, the testimony challenging the restrictions predominantly related to the hardship that the restrictions im-

experimental program in the case relied on by the appellees, *United Telegraph Workers v. FCC,* 436 F.2d 920 (D.C.Cir.1970), the Secretary's action in this case did not have a fixed termination date.

Second, if the Secretary believed that significant uncertainties existed, he was obligated to identify these uncertainties and to explain why this justified rescission *prior* to "engaging in a search for further evidence." *Motor Vehicle Mfrs. Ass'n,* 103 S.Ct. at 2871. *See Small Refiner Lead Phase-down Task Force v. United States EPA,* 705 F.2d 506, 520 (D.C.Cir.1983) ("When the facts are uncertain, the Administrator 'should so state and go on to identify the considerations he found persuasive.'") (quoting *Industrial Union Dep't v. Hodgson,* 499 F.2d 467, 476 (D.C.Cir.1974)). The Secretary did not explain why such research would be more fruitful if homework restrictions in the knitted outerwear industry are lifted. Just as we do not have the expertise required to substitute our judgment for the Secretary's, we do not have the expertise to fill significant omissions in the Secretary's reasoning. *See Motor Vehicle Mfrs. Ass'n,* 103 S.Ct. at 2874 ("[I]t is the

agency's responsibility, not this Court's, to explain its decision."). Finally, even were the appellees' argument accepted, it again would not remove all aspects of the Secretary's decision from the ordinary scope of review. For example, the desire to experiment would not excuse the Secretary's failure even to consider the alternatives discussed *infra.*

**34.** *Small Refiner Lead Phase-down Task Force,* 705 F.2d at 520 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed. 136 (1971)).

**35.** Following the Supreme Court's lead in *Motor Vehicle Mfrs. Ass'n,* we hold that an agency's failure to "cogently explain why it has exercised its discretion in a given manner," 103 S.Ct. at 2869, renders its decision arbitrary and capricious. Alternatively, our decision also rests on § 4(b) of the APA, 5 U.S.C. § 553(c) (1982), which requires that the agency provide an adequate statement of basis and purpose. *See Action on Smoking and Health v. CAB,* 699 F.2d 1209, 1215–16 (D.C.Cir.), *opinion supplemented by* 713 F.2d 795 (D.C.Cir.1983).

posed in *rural* Vermont. There was ample testimony indicating that the situation in Vermont was substantially different than that existing in more urban states and necessitated different treatment.[36] Specific proposals were advanced that would have permitted accommodation of these differences by means short of complete rescission of restrictions. The most detailed was a proposal submitted by the Attorney General of Vermont suggesting that the Secretary adopt a program whereby rural states meeting certain criteria could be authorized to certify homeworkers.[37] A comment from a Vermont Senator reiterated the possibility of expanding certification to permit homework by certain individuals whose circumstances precluded factory work.[38]

Perhaps the clearest indication that these proposals warranted serious consideration is provided by the Secretary's explanation of the rationale for rescission. In summarizing the evidence supporting rescission he said that commentators "cited the lack of adequate transportation, the need to remain at home to care for children and other family matters, as well as the lack of factory employment in most rural areas." 46

Fed.Reg. 50,348 (1981). He also indicated that "evidence was presented which showed that a continuation of the restrictions would have an adverse effect on employment opportunities, particularly in rural areas. . . . Much of this employment, the testimony and comments indicated, is in areas where public transportation is not available and few or no other gainful employment opportunities exist." *Id.* at 50,349. Obviously one potential means of redressing these concerns is to permit homework only in situations where these impediments to factory employment are shown to exist. The Secretary's explanation provides no basis whatsoever for rejecting this approach and instead allowing all individuals, in rural and urban areas, to engage in homework regardless of their circumstances.[39]

■ The Secretary's explanation of his decision does not provide the slightest indication that he gave any consideration to the alternatives raised in his original notice and the comments. Indeed, the affidavit of a Division official explaining the decision,[40] and the arguments of the appellees' counsel in this appeal,[41] make no claim that these alternatives received consideration.

---

**36.** *See* Office of Administrative Law Judges, U.S. Dep't of Labor, A Public Hearing to Commence Labor Department Review of "Homeworker Rules" 310 (Jan. 14, 1981) (hereinafter "Vermont hearings II"), *reprinted in* I J.A. 47 (statement of Marlene Walsh); Comments of Susan Auld (June 8, 1981), *reprinted in* I J.A. 237; Comments of John J. Easton, Jr. (Feb. 18, 1981), *reprinted in* I J.A. 135.

**37.** Comments of John J. Easton, Jr. (Feb. 18, 1981), *reprinted in* I J.A. 137–46.

**38.** Comments of Patrick J. Leahy (June 4, 1981), *reprinted in* I J.A. 229.

**39.** While we believe that the fact that narrower options might have achieved the employment benefits sought by the Secretary is a sufficient basis for compelling consideration of these options, such consideration was also dictated by other concerns. At a minimum, the record would lead a rational decisionmaker to recognize some uncertainties about the Secretary's capacity to enforce the minimum wage if homework is not restricted, and this is particularly true in urban areas. *See* text at notes 45–70 *infra*. Given these uncertainties, the Secretary should have considered whether the restrictions should only have been lifted in situations

where enforcement was most likely to be efficacious (*i.e.,* possibly in rural areas), or in those limited situations in which any risks created by these uncertainties were offset by a corresponding employment benefit.

**40.** Affidavit of Arthur H. Korn, Chief, Branch of Special Minimum Wages, Wage & Hour Division, Dep't of Labor (Jan. 25, 1982) (hereinafter "Korn Affidavit"), *reprinted in* II J.A. 555–67.

**41.** The appellees' only argument is that the Secretary did consider some different alternatives—*i.e.,* he considered lifting the rescission in all seven industries and doing so in a "non-experimental" fashion. Appellees' brief, pp. 62–63 n. 38. However, the agency's consideration of some alternatives does not free it from considering other obvious alternatives. A contrary holding would provide agencies an easy means to circumvent this aspect of reasoned decisionmaking, since they could, according to the Government, avoid considering obvious and potentially viable alternatives simply by showing that they considered any alternatives at all.

We also note that the Secretary's mention of the alternatives discussed here in the notice of

It is absolutely clear from decisions by the Supreme Court and this court that such an "artificial narrowing of options," *Pillai v. CAB,* 485 F.2d 1018, 1027 (D.C.Cir.1973), is antithetical to reasoned decisionmaking and cannot be upheld. Only last term the Supreme Court reaffirmed this principle in *Motor Vehicle Manufacturers Association.* There, NHTSA justified its rescission of a requirement that motor vehicles be equipped with either airbags or automatic seatbelts, by arguing that manufacturers were going to opt for automatic seatbelts and consumers would circumvent this option by detaching the seatbelts. The Supreme Court found this decision unreasoned and vacated the rescission. As we find in the instant case, the Court found that the agency's explanation could not justify its drastic decision to rescind rather than modify the standard to disallow the automatic seatbelts option. 103 S.Ct. at 2869 ("Even if this conclusion were acceptable in its entirety, standing alone it would not justify any more than an amendment of Standard 208 to disallow compliance by means of the one technology which will not provide effective passenger protection.") (citation omitted). The Court explained that "[a]t the very least this alternative way of achieving the objectives of the Act should have been addressed and adequate reasons given for its abandonment." *Id.*

The Court in *Motor Vehicle Manufacturers Association* indicated that it did not "broadly require an agency to consider all policy alternatives in reaching [a] decision. It is true that a rulemaking 'cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man ... regardless of how uncommon or unknown that alternative may have been ....'" 103 S.Ct. at 2871 (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978)). However, the options ignored by the Secretary in this case certainly cannot be characterized as "uncommon or unknown." These options were specifically mentioned in the notice of hearings and the comments received by the Secretary, and would be an obvious response to the concerns expressed by the Secretary.

Our decision in *Office of Communication of United Church of Christ v. FCC,* 707 F.2d 1413 (D.C.Cir.1983), is also analogous to the case at hand. In that case, we considered whether the FCC's decision to eliminate the requirement that licensees maintain programming logs and make those logs available to the public was arbitrary and capricious. We found that the Commission's failure "to give sufficient consideration" to the benefits of a more modest possibility—modification of log requirements to reflect more appropriately the informational needs of the Commission's new regulatory scheme—required remanding the Commission's decision on log requirements so that the Commission could undertake such an inquiry.[42]

In *Action on Smoking and Health v. CAB,* 699 F.2d 1209 (D.C.Cir.), *opinion supplemented by* 713 F.2d 795 (D.C.Cir. 1983), we emphasized that in addition to requiring rational consideration of alternatives, the APA demands an adequate explanation when these alternatives are rejected. Hence, we vacated a decision by the Civil Aeronautics Board to rescind certain restrictions on smoking in airplanes because the Board had failed adequately to address

hearing does not in any way change the arbitrary and capricious nature of his failure to ever discuss them again. There is no question that the Secretary was aware of these options; the issue is whether he gave them sufficient consideration and adequately explained his decision.

**42.** *See also State Farm Mut. Auto. Ins. Co. v. Department of Transp.,* 680 F.2d 206, 230 (D.C. Cir.1982) ("More important, NHTSA has failed to consider or analyze obvious alternatives to rescission, and has thus artificially foreclosed attempts to further the purpose of the Safety Act."), *vacated sub nom. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* —— U.S. ——, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *National Citizens Comm. for Broadcasting v. FCC,* 567 F.2d 1095, 1115 (D.C.Cir. 1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978); *Pillai v. CAB,* 485 F.2d 1018, 1027 (D.C.Cir.1973).

alternatives proposed in the comments. We relied on the requirement of section 4(b) that an agency engaging in notice and comment rulemaking "shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c) (1982). We indicated that while an agency "need not respond to every comment," *id.* at 1216, it must respond in a reasoned manner to " 'explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule.' " *Id.* (quoting *Rodway v. USDA*, 514 F.2d 809, 817 (D.C.Cir.1975) (footnote omitted)). The Board's claim that it had in fact considered the alternatives, and its attempt to rely on generalized and conclusory policy considerations as grounds for rejecting them, were inadequate: "[t]he Board must explain why a particular proposal is inconsistent with the balance between regulation and competition sought by the Board." *Id.*

In the same manner, we hold that the Secretary should have considered and explained why the proposals mentioned in his notice of hearing were inconsistent with the balance he sought between maximizing employment and effective enforcement of the minimum wage. We do not suggest that he had to opt for any particular one of these proposals. However, he was required to address common and known or otherwise reasonable options, and to explain any decision to reject such options. His complete

failure to satisfy these quintessential aspects of reasoned decisionmaking is the primary basis [43] for our decision to vacate his rescission of the restrictions in the knitted outerwear industry.

### C. *Other Unreasoned Aspects of the Decision*

#### 1. Enforcement Feasibility

Our decision to vacate is also grounded in the unreasoned nature of the Secretary's decision that an effective enforcement program would be feasible if restrictions on homework in the knitted outerwear industry were lifted. Before explaining the particular deficiencies in the Secretary's analysis, we shall summarize and review the evidence that was before the Secretary when he made this decision. We engage in this inquiry not in an effort to "upset the agency's view of the facts"[44] but instead to highlight "the limitations of this record in supporting the agency's decision." *Motor Vehicle Manufacturers Association,* 103 S.Ct. at 2871.

The evidence in the record supporting the Secretary's decision is at best minimal.[45] It comes primarily from Vermont home knitters and their representatives who indicated that knitters were paid more than the minimum wage. These knitters often did not have records of the hours they worked[46]—in fact, some testified that factors such as distractions at home made estimating the number of hours virtually im-

---

**43.** While the foregoing discussion provides the clearest basis for our holding that the Secretary's decision was arbitrary and capricious, the discussion in sections C1 & C2, *infra,* provides *independent* (rather than cumulative) reasons for our holding.

**44.** Our inquiry could hardly be construed otherwise, since the agency's view of almost all of the facts discussed here is never indicated other than in the most general terms.

**45.** This evidence is described in the appellees' brief, pp. 49–50. The Government does not mention the study by the Illinois Department of Labor, although this study was cited by the lower court. In view of the fact that 109 investigations in that study revealed 41 establishments in violation of one or more labor laws, 349 violations of the Industrial Home Work

Law, and 315 violations of the Illinois Minimum Wage Law, LABOR LAW ENFORCEMENT DIV., ILLINOIS DEP'T OF LABOR, THE ILLINOIS INDUSTRIAL HOMEWORK LAW/FEDERAL HOMEWORK REGULATIONS 16 (1980), *reprinted in* I J.A. 126, its results hardly compel its cursory recommendation that the Federal homework restrictions "are discriminatory" and should be removed. *Id.* at 21, I J.A. 132. The Secretary's decision does not reflect acceptance of this recommendation, since he rejected the lifting of restrictions in six of the seven restricted industries.

**46.** Vermont hearings II, *supra* note 36, at 228–29, *reprinted in* I J.A. 27–28 (statement of Luelle Breen); *id.* at 264–65, I J.A. 40–41 (statement of Emma Pudvah).

possible [47]—and made no claims about the wages paid to homeworkers outside the rural setting of Vermont. The appellees also claimed that there were data showing that the homework restrictions did not reduce the incidence of violations of the Act. The explanations of these data by both the appellants and the appellees reveal that these data provide no meaningful support for this conclusion.[48]

47. *Id.* at 257, *reprinted in* I J.A. 37 (statement of Virginia Gray); *id.* at 273–74, I J.A. 42–43 (statement of Peggy York).

48. The appellees point to data showing that the percentage of complaints investigated that proved to be valid was virtually the same for homeworkers in restricted (68%) and non-restricted industries (61%), WAGE & HOUR DIV., U.S. DEP'T OF LABOR, SUMMARY OF WAGE AND HOUR DIVISION INVESTIGATIONS OF EMPLOYERS UTILIZING HOMEWORKERS BY RESTRICTED AND NONRESTRICTED INDUSTRIES (FY 1975–FY 1980), *reprinted in* II J.A. 553, and for factory workers, Korn Affidavit, *supra* note 40, at 6, *reprinted in* II J.A. 560. In essence, these data only reveal that employees generally do not file complaints unless they are well founded. It does not indicate the rate at which actual violations occur. The appellees themselves concluded, in response to the appellants' suggestion that the figures demonstrate significant minimum wage violations, that "[t]hey do not by any stretch of the data 'indicate a violation rate of over 60 [percent] for homeworkers in both restricted and non-restricted industries,' as plaintiffs charge. (Pl. Br. 38) Indeed, they do not identify any actual violation rate for either group of homeworkers." Appellees' brief, p. 54. This is significant because the "total misconstr[uction]" of the data that the appellees decry, *id.,* also appears to underlie the Secretary's understanding of the data. In describing the "process by which the Department of Labor reviewed the existing regulations," Arthur H. Korn, the Chief of the Division's Branch of Special Minimum Wages, explained that "[t]hese statistics indicated *that the rate of minimum wage or overtime violations in homework was not significantly different in the restricted and nonrestricted industries"* and that "violations found in all investigations (factory and homework) . . . averaged approximately 68 percent, the same as the average rate of violation found in the restricted homework industries . . . ." Korn Affidavit, *supra* note 40, at 1, 6, *reprinted in* II J.A. 555, 560.

The Department's 1959 study provides somewhat stronger support for the Secretary's position. It found that "one out of six of the establishments employing homeworkers were in violation of the minimum wage, overtime, or child labor provisions of the [Act]," 1959 RE-

PORT, *supra,* at 3, *reprinted in* II J.A. 477, that "three out of 10 homeworkers did not have the handbooks required by regulations," *id.,* that seven percent of all homeworkers "were found to be paid at less than the minimum wage during the profile workweek," *id.* at 8, II J.A. 482, and that "the incidence of violations of the minimum wage provisions was about the same in the group of restricted industries as in the group of non-restricted industries." *Id.* at 3, II J.A. 477.

However, the value of these data is limited. *The conclusions are based on investigations by* Division officials "who collected data by examining employers' records and interviewing the employers and some of the homeworkers." *Id.* at 2, II J.A. 476. As the 1942 findings indicated, establishing violations when homeworkers are involved is an extremely onerous task. For example, it is complicated by the difficulty of identifying homeworkers, 1942 FINDINGS, *supra,* at 26, *reprinted in* I J.A. 92, and the fact that employers violating the Act may distort records so that homeworkers appear to receive the minimum wage. *Id.* at 21, I J.A. 87. Hence, it is not surprising that the findings in the 1959 report are qualified:

> The survey findings probably understate the degree of violation of the Fair Labor Standards Act by employers of homeworkers because of the difficulty of determining the number of hours worked by homeworkers and whether or not children participated in the work. The violations shown are those which investigators could establish without an unreasonable expenditure of time.

1959 REPORT, *supra,* at 2, *reprinted in* II J.A. 476.

The appellants also challenge the significance of the finding that the incidence of violations involving homeworkers is the same in restricted and non-restricted industries. They argue that one would expect wage violations to be common *when homeworkers are used*—regardless of whether the industry is restricted or unrestricted—and that the relevant consideration is whether restrictions reduce the aggregate number of violations by causing homeworkers to be *used less often* in restricted industries. There was no indication that this possibility was considered by the Secretary, and we discuss the significance of this omission *infra.*

ments, suggesting that the enforcement problems created by homework continue today. Comments received from five former Secretaries of Labor argued that lifting the restrictions would "turn America back to the dark ages of industrial inhumanity." Secretaries' Comments, *supra* note 1, *reprinted in* I J.A. 172, 174, 176. Opposition was also voiced by the former Administrator of the Division from 1958 to 1969. Comments of Clarence Lundquist (June 18, 1981), *reprinted in* I J.A. 252. Law enforcement officials in California, Connecticut and New York, all of whom must deal with large urban centers, argued that homework defies effective enforcement of the minimum wage unless restricted.[49] The record further reveals the concerns of a Regional Administrator of the Department's Employment Standards Administration:

> Additionally, homeworking is a perfect vehicle for utilizing and taking advantage of undocumented workers, it has been disclosed through investigations. Our many investigations covering manufacturing industries has [sic] also uncovered

realistic examples of the abuses of the industrial homework regulations, both state and federal.[50]

The record includes specific evidence indicating that homeworkers are typically paid subminimum wages. The Administrator of the Division of Labor Standards for the Rhode Island Department of Labor testified that "[w]hen we have interviewed home workers we have found that they are paid 10 to 70 percent of the prevailing minimum."[51] Similarly, a California enforcement official testified that he had yet to find a homeworker in Los Angeles County, Santa Clara County, or San Diego County who had been paid more than $2.25 an hour.[52]

These conclusions are buttressed by a 1980 action brought by the Department against a manufacturer who allegedly was illegally employing homeworkers in the knitted outerwear industry in Vermont. The complaint alleged willful and repeated violations of the minimum wage, overtime, compensation, and recordkeeping require-

**49.** Office of Administrative Law Judges, U.S. Dep't of Labor, A Public Hearing to Commence Labor Department Review of "Homeworker Rules" 145 (Jan. 13, 1981) (hereinafter "Vermont hearings I"), *reprinted in* I J.A. 18 (statement of Donald DeFillippi, Assistant Director of the Division of Regulation of Wages, Connecticut Department of Labor) ("Where homework is being performed, there is absolutely no way to prevent the circumvention or evasion of and to safeguard the minimum wage."); Comments of William L. O'Toole (May 27, 1981), *reprinted in* I J.A. 198 ("Piecegoods contracting is a very highly competitive industry requiring little capital. The manufacturers, or 'jobbers', who give out the work are for the most part only interested in getting the cheapest price from their contractors and are quite ready to close their eyes to the conditions under which the work is done. The contractors are hard-pressed, sometimes making out little better than their employees. They are forced to cut their costs in every way possible, or they will simply not get the work. It would be surprising if widespread, systematic violation of the wage and hour laws did not result from these circumstances. Only systematic enforcement will correct these abuses. Removal of Part 530 will make systematic enforcement impossible."); Comments of Donald Vial (May 15, 1981), *reprinted in* I J.A. 158 ("Enforcement experience in California has demonstrated be-

yond any doubt that maintenance of minimum standards for Industrial Homework is practically impossible because workers will not step forward to complain because they fear losing their only means of survival.").

**50.** State of New York Department of Labor Public Hearing on Industrial Homework 6 (April 2, 1981) (hereinafter "New York hearings"), *reprinted in* II J.A. 370 (statement of Frank Mercurio). *See also* Vermont hearings I, *supra* note 49, at 42 (statement of Arthur Korn) ("Our experience in enforcing the minimum wage law and that of states who have had experience in that area have found that maintaining the minimum wage for homeworkers is still a problem, a continuing problem.").

**51.** Office of Administrative Law Judges, U.S. Dep't of Labor, A Public Hearing to Commence Labor Department Review of "Homeworker Rules" 118 (Feb. 18, 1981) (hereinafter "Washington, D.C. hearings I"), *reprinted in* I J.A. 66 (statement of Roberta F. Orticerio).

**52.** Office of Administrative Law Judges, U.S. Dep't of Labor, A Public Hearing to Commence Labor Department Review of "Homeworker" Rules 412 (Feb. 17, 1981) (hereinafter "Washington, D.C. hearings II"), *reprinted in* I J.A. 54 (statement of Joe Razo).

ments of the Act.[53] An accompanying affidavit from a compliance officer in the Division indicates that the Division's investigation revealed that "a total of $40,673.05 in back wages is due 58 homeworkers."[54] This number is substantial in light of a Vermont official's testimony that there are only 200 to 400 homeworkers in Vermont.[55]

 The appellees' defense of the Secretary's determination that enforcement would be feasible is predicated on their belief that determinations of this type—which involve assessment of the Department's enforcement capacity and predictive judgments about the utility of certain enforcement techniques—"are unquestionably committed to the discretion of the agency charged with protecting those interests, not to courts or litigants." Appellees' brief, p. 42. We agree with the appellees that this court must be particularly deferential when reviewing an agency's predictive judgments about areas that are within the agency's field of discretion and expertise. *See FCC*

v. *WNCN Listeners Guild,* 450 U.S. 582, 594–95, 101 S.Ct. 1266, 1274, 67 L.Ed.2d 521 (1981); *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 813–14, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978); *FPC v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961); *Building & Construction Trades' Department v. Donovan,* 712 F.2d 611, 629 (D.C.Cir.1983). However, we reject the appellees' position insofar as they would treat the predictive nature of the judgment "as though it were a talisman under which any agency decision is by definition unimpeachable." *Motor Vehicle Manufacturers Association,* 103 S.Ct. at 2870 (referring to rule that court may not impose additional procedural requirements upon an agency).

 The Supreme Court has never indicated that when an agency is making a predictive judgment it need not engage in reasoned decisionmaking.[56] Because new

---

**53.** Plaintiff's Complaint at 2–3, *Marshall v. C.B. Sports, Inc.,* Civ. No. 79–299 (D.Vt. filed Feb. 7, 1980), *reprinted in* II J.A. 599–600.

**54.** Affidavit of Michael J. Leclair, Compliance Officer, Wage & Hour Division, U.S. Dep't of Labor (Dec. 23, 1980), *reprinted in* II J.A. 601.

**55.** Washington, D.C. hearings I, *supra* note 51, at 68, *reprinted in* I J.A. 61 (statement of Joel Cherington).

**56.** The appellees rely on Supreme Court cases reviewing the Federal Communications Commission's (FCC's) implementation of the Communications Act's "public interest, convenience, and necessity" standard. 47 U.S.C. §§ 309(a), 310(b) (1976). In these cases, the Court has held that "complete factual support in the record for the Commission's judgment or prediction is not possible or required; 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.' " *FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. at 814, 98 S.Ct. at 2121 (quoting *FPC v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961)). *Accord FCC v. WNCN Listeners Guild,* 450 U.S. at 594–95, 101 S.Ct. at 1274.

However, the suggestion that such determinations are entitled to deference and do not require *complete* factual support does not mean that agencies are free to engage in unrea-

soned decisionmaking. Specifically, there is no indication in these cases that agencies can ignore important factors in making predictions, or can reach judgments that are irrational given the relevant evidence in the record. To the contrary, in *WNCN Listeners Guild,* the Court found that the FCC "has provided a rational explanation for its conclusion," 450 U.S. at 595, 101 S.Ct. at 1274, and that its position "reflects a reasonable accommodation" of the competing policy considerations. *Id.* at 596, 101 S.Ct. at 1275. Similarly, the factual determination that underlay the FCC's policy choice in *National Citizens Comm. for Broadcasting* "was grounded in a rational prediction, based on its knowledge of the broadcasting industry and supported by comments in the record." 436 U.S. at 808, 98 S.Ct. at 2119. *Cf. FPC v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. at 29–30, 81 S.Ct. at 450 (holding that Commission's forecast about effect of certain conduct on future prices "necessarily involves deductions based on the expert knowledge of the agency," but also noting that a considerable showing was made that the forecast was well grounded and that "as a matter of common sense," the correctness of the forecast was difficult to deny).

We also have some question about whether the deference shown to FCC decisions is necessarily appropriate for all predictive judgments by agencies. As the Supreme Court has previously noted, "[u]nderlying the whole [Communications Act] is recognition of the rapidly fluc-

agency policies often will involve some element of prediction about the future effects of those policies, the arbitrary and capricious standard of judicial review would be effectively nuliified if a court seriously entertained the position espoused by the appellees. The presence of an element of prediction is particularly likely when such policies involve dramatic departures from longstanding policy, and yet it is evident that such policies are not immune from judicial review. The implication that such decisions are completely insulated from meaningful judicial review ignores the Supreme Court's admonition that " 'expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.' " *Motor Vehicle Manufacturers Association,* 103 S.Ct. at 2869 (quoting *New York v. United States,*

342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (1951) (Douglas, J., dissenting)).[57] While we respect an agency's superior position to make judgments involving elements of prediction, we will review the record and the agency's decision to assure that "it identified all relevant issues, gave them thoughtful consideration duly attentive to comments received, and formulated a judgment which rationally accommodates the facts capable of ascertainment and the policies slated for effectuation." *Telocator Network of America v. FCC,* 691 F.2d 525, 544 (D.C.Cir.1982).[58]

■ Our review of the record and the Secretary's explanation of his decision indicates that the Secretary has not given sufficient consideration to factors that may be highly relevant to the Department's ability

tuating factors characteristic of the evolution of broadcasting and of the corresponding requirement that the administrative process possess sufficient flexibility to adjust itself to these factors." *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940). *See also United States v. Southwestern Cable Co.,* 392 U.S. 157, 173, 88 S.Ct. 1994, 2003, 20 L.Ed.2d 1001 (1968) (Congress acted in a field that was new and dynamic and gave Commission expansive powers); *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 525 F.2d 630, 638 n. 37 (D.C.Cir.) ("The substantial discretion generally allowed the F.C.C. in determining both what and how it can properly regulate, is often attributed to the highly complex and rapidly expanding nature of communications technology."), *cert. denied,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976).

The Court's decision in *Motor Vehicle Mfrs. Ass'n* also suggests that predictive judgments by agencies must be reasoned. In that case, the Court reviewed NHTSA's determination that it could not "reliably predict" that automatic seat belts would increase belt usage by five percent, 103 S.Ct. at 2871, to see if the agency's claim of uncertainty was supported by the record and reasonably explained. *Id.* The Court found that the agency's statement "take[s] no account of the critical difference between detachable automatic belts and current manual belts.... Whether [the possibility that the inertia factor which favors usage when automatic belts are installed will substantially increase seatbelt use] is in fact the case is a matter for the agency to decide, but it must bring its expertise to bear on the question." *Id.* at 2872. In our view, there is no reason for greater deference when an agency decides that data does permit a certain prediction than

when it reaches the contrary conclusion. In either case, courts are capable of following the approach employed in *Motor Vehicle Mfrs. Ass'n* to ascertain whether the agency's decision is based on a consideration of relevant factors and is otherwise a product of reasoned decisionmaking.

57. *See generally Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850 (D.C.Cir.1970) ("Expert discretion is secured, not crippled by the requirements for substantial evidence, findings and reasoned analysis.... A court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent. 'The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia.' ") (quoting *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Comm'n,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090, *modified by order,* 392 U.S. 901, 88 S.Ct. 2049, 20 L.Ed.2d 1361 (1968)), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

58. We note also that the appellees' request for "extreme deference" is particularly dubious in a case such as this, where the agency's prediction relates to the efficacy of a policy that has been tried unsuccessfully in the past, and when the record contains statements by a number of state enforcement officials and former leaders of the agency suggesting that the policy will not be effective.

to enforce the Act without homework restrictions. Initially, there is no indication that the Secretary gave any serious consideration to the possibility that lifting restrictions would substantially increase the number of homeworkers.[59] This failure is important because the Secretary's judgment that the Division's staff could enforce the Act was explicitly based on his view "that homeworkers will comprise only a small percentage of the approximately 63,000 production employees in this industry . . . ." 46 Fed.Reg. 50,349 (1981).[60]

There is certainly a very real possibility that the number of homeworkers will substantially increase because of the rescission of restrictions. See Gemsco, Inc. v. Walling, 324 U.S. 244, 254 n. 17, 65 S.Ct. 605, 611 n. 17, 89 L.Ed. 921 (1945) ("Under the National Industrial Recovery Administration, 118 of the 556 codes included homework provisions; and 86 percent of the 118 prohibited homework. Homework in consequence was greatly reduced, but its volume turned sharply upward when the National Industrial Recovery Act was declared unconstitutional in Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935)."). As the appellees point out, approximately thirty percent of knit-

wear employees were homeworkers in 1942, but today only 1.6% of them are. Appellees' brief, p. 10. While the causal relationship between restriction and this decline is speculative, even the appellees appear to acknowledge that it is logical to assume the existence of such a relationship.[61] Indeed, this assumption appears implicit in the very basis for the Secretary's decision: rescission is necessary to avoid "substantial curtailment of employment opportunities." 46 Fed.Reg. 50,349 (1981). Obviously, this curtailment is only avoided if rescission results in a greater number of employees in homework than is the case under the restrictions.[62] Additionally, even if the percentage of knitted outerwear employees that are homeworkers rises to only forty percent of the 1942 level, the number of homeworkers would be the same as in 1942 because of increases in the industry's total employment.[63]

The Secretary also failed to give adequate consideration to the differences between enforcing the Act when homeworkers are used in rural areas and when they are used in urban areas. As we have noted, much of the evidence on which the Secretary's determination was based came from the testimony and comments of individuals

**59.** We are unwilling to conclude that the Secretary's general and wholly unverified conclusion that "it appears" that the number of homeworkers will be small, 46 Fed.Reg. 50,349 (1981), reflects sufficient consideration of the possibility that the number will increase. See Action on Smoking and Health, 699 F.2d at 1217 ("We are told that the decision was made '[a]fter considering the outstanding proposals,' yet no evidence of that consideration is given. To accept the Board's action would render judicial review of informal rules meaningless.").

**60.** Additionally, this consideration is relevant to whether restrictions have reduced the aggregate number of violations of the Act when homeworkers are used, by decreasing the number of homeworkers. See note 48 supra.

**61.** Appellees' brief, p. 56 ("It was, of course, logical to assume that homework was a more widespread phenomenon in 1942, since at that time homework had not been outlawed for 40 years, as is the case today.").

**62.** The appellees recognize the potential contradiction in the Secretary's position and argue

that the Secretary could rationally have found that rescission would increase the number of homeworkers—and hence employment—but would not increase it so dramatically that enforcement of the Act would be impossible. However, the Secretary's explanation of his decision does not provide any indication that he was aware that his predictions yielded potentially incongruous results, or that he made a reasoned decision that the number of homeworkers would fall within the middle ground suggested by the appellees. Moreover, we cite the Secretary's employment finding only as additional evidence of the possibility that the number of homeworkers would increase following restrictions, which, when evaluated in conjunction with other reasons to suspect that this might happen, leads us to conclude that the Secretary should have considered this possibility.

**63.** The industry employs 63,000 production workers today, 46 Fed.Reg. 50,349 (1981), compared to "22,500 wage earners on manufacturing processes and an additional 2,100 salaried employees" in 1939. 1942 FINDINGS, supra, at 6, reprinted in I J.A. 72 (footnote omitted).

from rural Vermont.[64] Some of this testimony, and much of the testimony from enforcement officials in more urban states, emphasized the substantial differences between rural and urban areas, and indicated that the conditions requiring restrictions in urban areas were not duplicated in rural areas.[65] In particular, it was suggested that the greater numbers of undocumented workers in urban areas, sometimes having low incomes and obviously in no position to complain if employers mistreat them, created a serious enforcement problem. There was also testimony that immigrants are particularly susceptible to subminimum wages because of language barriers and cultural differences.[66] It is also possible that in rural areas enforcement officials are less likely to experience problems such as "[t]he constant change in address of low-income families and the high turnover in home work employees" which were reported as impediments to enforcement by the Administrator in his 1942 findings. 1942 FINDINGS, *supra,* at 26, *reprinted in* I J.A. 92.

We do not mean to suggest that these possibilities are grounded in fact, or that the Secretary was obligated in his ultimate decision to differentiate between rural and urban areas. However, there are obvious and substantial differences between rural and urban areas, and there was substantial evidence in the record indicating that some of these differences were highly relevant to enforcement of the Act when homeworkers are employed. Consequently, the Secretary's failure even to consider these differences, particularly in light of his significant reliance on testimony from individuals in rural Vermont, was not reasoned decision-making.

Finally, we do not think that the Secretary's explanation reflects sufficient consideration of the specific impediments to enforcement of the Act presented by homework. The Administrator's 1942 findings identified numerous obstacles to previous enforcement efforts when homeworkers are used and explained that these are *intrinsic* features of homeworker employment. These included the difficulty of identifying and locating workers that are employed as homeworkers, a problem that would seem

**64.** The Commissioner of the Vermont Department of Employment Security testified that "[b]y some definitions, Vermont is considered to be the most rural state in the nation. Only eight of its 246 communities have populations over 10,000, and Burlington, its largest city, has fewer than 50,000 people." Washington, D.C. hearings I, *supra* note 51, at 55, *reprinted in* I J.A. 60 (statement of Sandra Dragon).

**65.** Washington, D.C. hearings I, *supra* note 51, at 65–66 (statement of Joel Cherington) (By permitting homework where workers are not within a mile of public transportation "the Department would be able to distinguish between homework in heavy congested urban areas, such as New York and Los Angeles, and homework conducted in rural states such as Vermont. If the principal problem addressed by Regulation 530 is the exploitation of immigrant workers in our major cities, as I believe it is, my suggestion would enable that problem to be addressed without disrupting Vermont and other state's economy [sic]."); Washington, D.C. hearings II, *supra* note 52, at 410, *reprinted in* I J.A. 52 (statement of Joe Razo) ("I wish some of the ladies who say they are earning more than the minimum wage on the piece rate basis would come to California. We need experienced operators, but you will quickly find that

your price will be undercut by the recently arrived immigrant from Korea, from Hong Kong, from Cambodia, from Tailand [sic], and more recently, the Vietnamese. If they do not undercut your wage, then we have the tremendous influx of undocumented workers from Mexico."); Comments of John J. Easton, Jr. (Feb. 18, 1981), *reprinted in* I J.A. 135 ("My amendment also recognizes that the exploitation which gave rise to Part 530 does not accurately pertain to all homework and is a destructive over-generalization when applied to Vermont. Our culture, climate, settlement patterns and economics make homework a necessary and dignified employment possibility for many of our citizens."); Comments of William L. O'Toole (May 27, 1981), *reprinted in* I J.A. 197, 198 ("Removal of Part 530 would create a strong positive incentive for the hiring, and exploitation, of illegal aliens and welfare abusers, rather than the honest citizens and legitimate immigrants who would not fear to complain about subminimum wages.... A problem that arises when the rules are applied specifically in rural areas, provides no basis for the sweeping elimination of regulations which have their principal impact in urban areas.").

**66.** *See* Comments of William L. O'Toole (May 27, 1981), *reprinted in* I J.A. 197.

most likely when employers have been violating the Act and may wish to impede enforcement. The 1942 findings also indicated that it was difficult to ascertain the number of hours worked by individual homeworkers, even when employers are acting in good faith. Other problems were identified in the findings, and the appellees do not point to any specific evidence in the record suggesting that these impediments are less likely to exist today.

**67.** On appeal, the appellees included in their brief a number of documents delineating the nature of this compliance effort. This inclusion is somewhat surprising because the Secretary's announcement of the rescission contains no indication that the basis for this action included consideration of particular—but unspecified—enforcement plans. Moreover, the Supreme Court has indicated that in applying the "arbitrary and capricious" standard, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam). Nevertheless, we need not decide whether this evidence could not be used to support the Secretary's decision, because even if it is considered it does not change the result in this case. There is no indication that the strategies revealed in the document—generally, use of time studies and piece rates, education of homeworkers, and intensified investigative efforts—are materially different than those strategies attempted without success by the states and the Federal Government prior to the imposition of restrictions. Nor is there any indication of why such strategies can overcome the specific impediments to enforcement that traditionally have been viewed as insuperable.

**68.** The Secretary's explanation of his decision does not include the suggestion he made in the notice of proposed rulemaking that homeworkers would be more likely to report violations if restrictions were lifted. 46 Fed.Reg. 25,109 (1981). Because the Secretary did not mention this possibility as a basis for his decision, the appellees' attempt to resurrect it is unavailing. Indeed, it should also be noted that the record includes an explanation of why such an increase in reporting is not likely to occur. Comments of William L. O'Toole (May 27, 1981), *reprinted in* I J.A. 197.

**69.** We have already noted that the Secretary's suggestion that the number of homeworkers will be small is not the product of reasoned decisionmaking. The Secretary also suggested that there is greater acceptance of the minimum wage today than there was in 1942. 46

The Secretary's explanation of his decision does not address these concerns. Instead, the Secretary argues that because of increased acceptance of the minimum wage, and the developing expertise of his enforcement officials, a "concerted compliance program" [67] by the Department will insure effective enforcement of the Act.[68] The Secretary's statements are unsupported by the record [69] and, in effect, ask us to accept the Secretary's conclusory assur-

Fed.Reg. 50,349 (1981). We do not find this proposition as self-evident as the appellees suggest, and the appellees cite no supporting evidence in the record other than the testimony of the Vermont home knitters regarding their own experiences. Appellees' brief, pp. 52–53. However, there was also evidence in the record, including references to the Department's own investigation of CB Sports, Inc., suggesting that payment of subminimum wages to employees is pervasive. Hence, even assuming *arguendo* that there is general acceptance of the minimum wage, there is little question that violations continue, and the relevant issue is whether enforcement efforts can prevent them if homework is unrestricted.

The Secretary also suggested that enforcement was not possible in 1942 because the Department was newly established. However, regulation of homework was certainly not a new phenomenon in 1942; the Department had years of prior state and Federal experience to draw on. The record also indicates that even the most intensive enforcement efforts by state and Federal bodies had not effectively controlled substandard labor practices in homework. Again, the appellees do not point to anything in the record suggesting that the Department's "new" concerted compliance effort really contains anything "new" at all. Moreover, a recent study by the General Accounting Office, quoted by the International Ladies' Garment Workers' Union in its comment on the proposed rescission, calls into question the Department's present enforcement capacity:

[The Department of] Labor's investigations of establishments demonstrate that non-compliance with FLSA recordkeeping, minimum wage, and overtime provisions is a serious and continuing problem. Labor is able to investigate annually only a small percentage of firms covered by the act. For example, in 1979 Labor investigated less than 2 percent of the 4.1 million establishments with paid employees subject to FLSA provisions. The number of covered establishments was last determined by Labor in 1977. Although Labor attempts to act on all FLSA complaints received, the complaint backlog has remained fairly constant—between 21,000 and

ances and to assume that the impediments to enforcement of the Act which were considered "inherent in the home work practice" in 1942, 1942 FINDINGS, *supra,* at 26, *reprinted in* I J.A. 92, have disappeared with the passage of time.

We do not believe that the Secretary was free to ignore the specific impediments identified in the 1942 findings, and we also may not ignore them. Acceptance of the Secretary's claims would be an abdication of our responsibility to see that he has engaged in reasoned decisionmaking. This we refuse to do.[70] Because of the Secretary's failure to consider adequately factors identified in this subsection, his judgment that removing restrictions would not prevent effective enforcement of the Act was arbitrary and capricious and cannot be upheld.

### 2. Curtailment of Employment

■ While the Secretary's decision was significantly motivated by his finding that substantial curtailment of employment opportunities would result from continued restrictions in the knitted outerwear industry, we find his abbreviated analysis of this issue completely inadequate. The Secretary's explanation of his view evidences no serious consideration of whether any employment benefits from rescinding restrictions will be offset by resulting employ-

ment losses and reductions in the earning power of factory workers.

Initially we note that our analysis of this specific deficiency in the Secretary's analysis is confounded by the Secretary's failure to articulate satisfactorily even the most rudimentary aspects of his findings. Specifically, it is not at all clear whether the Secretary's finding that the restrictions curtailed employment opportunities means that: (1) restrictions jeopardized *existing* illegal employment of homeworkers; (2) restrictions foreclosed *additional* opportunities in homework; or (3) restrictions did not affect *actual* employment, but were removed to legalize the status of existing homeworkers. While the lower court believed that the Secretary's finding was predicated on the second rationale,[71] the connection between the facts cited by the Secretary (*i.e.,* that many people *currently* work as homeworkers) and such a finding is mystifying. Because of other deficiencies in the Secretary's reasoning regarding the employment benefits of rescission, discussed *infra,* it is unnecessary for us to decide whether the ambiguity as to his actual finding requires reversal. We highlight them because they illustrate the difficulties this court would face if it attempted to fill in the numerous gaps in the Secretary's reasoning. In effect, to cure the deficiencies in the Secretary's analysis we would be required to substitute our reasoning for the

25,000—during the 3 fiscal years ended [sic] 1979.

COMPTROLLER GENERAL OF THE UNITED STATES, CHANGES NEEDED TO DETER VIOLATIONS OF FAIR LABOR STANDARDS ACT, A REPORT TO THE CONGRESS 4 (May 28, 1981), *quoted in* ILGWU Comments, *supra,* at 62, *reprinted in* II J.A. 360 (footnote omitted).

In evaluating these considerations, we respect the Secretary's expertise in ascertaining the enforcement capacity of his staff. However, as we have indicated, our deference to his expertise "cannot be allowed to slip into a judicial inertia." *Volkswagenwerk Aktiengesellschaft,* 390 U.S. at 272, 88 S.Ct. at 935 (quoting *American Ship Bldg. Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965). In light of the minimal evidence in the record supporting his position, we think it clear that the Secretary's generalized claims about enforcement capacity and changing attitudes

cannot justify his failure to address the specific impediments to enforcement revealed by the Department's exhaustive analysis in 1942.

**70.** *See Office of Communication of United Church of Christ v. FCC,* 707 F.2d 1413, 1442 (D.C.Cir.1983) (refusing to accept the FCC's "conclusory assurances" that its ability to regulate would not be diminished by changes that included elimination of the requirement that radio licensees maintain programming logs; vacating because "the Commission has failed to give adequate consideration to the vital information role that the logging requirements presently serve in the overall scheme of the Communications Act").

**71.** *International Ladies' Garment Workers' Union v. Donovan,* Civ. No. 81–2606, mem. op. at 11 (D.D.C. July 23, 1982), *reprinted in* II J.A. 613.

patently superficial explanation provided by the Secretary.

Assuming that the Secretary reasoned that without restrictions more homeworkers would be employed in the knitted outerwear industry, he did not adequately consider the possibility that this employment increase would be offset by economic injury to factory workers. The record included testimony and comments suggesting that such injury would result because homework competition would reduce factory wages and employment,[72] and some manufacturers would be unable to compete and would be driven out of business.[73] Hence, the employment "benefit" of the rescission might simply be a shift in employment from factories to homes, with no *net* increase in employment opportunities.

The Secretary's only response was that "these comments did not present adequate substantiating evidence." 46 Fed.Reg. 50,-349 (1981). While this response is accurate, it does not constitute sufficient consideration of the concerns raised in the comments. The appellees do not question the appellants' claim that the Secretary's decision is premised on his desire to increase net employment opportunities, or their claim that this required the Secretary to consider both the employment benefits and detriments of the Secretary's decision. In the circumstances of this case, this responsibility required the Secretary to do more than simply dismiss the concerns raised in the comments because of their lack of substantiating evidence.[74] As the appellees repeatedly point out, this is a case where only a limited amount of hard data exists and the Secretary had to make a decision largely in the absence of such data. This factor, however, cuts in both directions. As the Secretary did not feel constrained by the absence of such data in predicting that rescission would provide substantial employment benefits, we cannot fathom his failure seriously to consider offsetting detriments solely on the ground that this possibility was not substantiated by hard data.

The possibility of employment detriments resulting from unrestricted homework is a serious concern and deserves the Secretary's careful consideration. As we have said, the record contains substantial evidence suggesting that homeworkers will be paid subminimum wages, and one of the reasons the Act was passed was to protect all employers and employees from the economic consequences of subminimum wages. Moreover, even if homeworkers are hired and paid lawful wages, this in no way suggests that employees in the industry as a whole will be benefitted.[75]

The Secretary's explanation of the employment consequences of rescission does not begin to address these concerns.[76] In

---

72. *E.g.*, Comments of National Hand Embroidery & Novelty Mfrs. Ass'n (May 20, 1981), *reprinted in* I J.A. 166–67 (lifting restrictions will cause average wage in industry to fall to Federal minimum so that employers can compete with homework employers); Comments of AFL–CIO Executive Council (May 7, 1981), *reprinted in* I J.A. 204 (removal of restrictions will encourage employers to divert work from factories to unprotected homeworkers).

73. *E.g.*, Comments of Wisconsin State AFL–CIO (June 23, 1981), *reprinted in* I J.A. 259 (revocation of prohibition on homework in garment industry "would result in legitimate businesses being forced to close"); Comments of Ass'n of Knitted Fabrics Mfrs., Inc. (May 7, 1981), *reprinted in* I J.A. 153 (removal of restrictions would result in unemployment and may drive small manufacturers out of business).

74. *Cf. National Lime Ass'n v. EPA,* 627 F.2d 416, 443 (D.C.Cir.1980) (where EPA had statutory duty to promulgate achievable standards and this required analysis of relevant variables, industry's failure to provide data or assist in analysis in any meaningful way did not lift "the burden from the Agency of pursuing what appears to be a relevant variable or at the least discussing in its document why it was not considered important").

75. *See, e.g.,* New York hearings, *supra* note 50, at 100, 101, *reprinted in* II J.A. 376, 377 (statement of Frank Mercurio).

76. As we have explained, the responsibility for consideration and discussion of such concerns is the agency's, and not this court's. Hence, it would not be proper for us to follow the lead of the District Court and speculate that "it is also possible that a net gain in jobs, either due to cost savings or to sales by employers of home-

the absence of such analysis, we believe it is clear that the Secretary's decision was arbitrary and capricious.

CONCLUSION

■ We recognize that a new administration may try to effectuate new philosophies that have been implicitly endorsed by the democratic process. Nonetheless, it is axiomatic that the leaders of every administration are required to adhere to the dictates of statutes that are also products of democratic decisionmaking. Unless officials of the Executive Branch can convince Congress to change the statutes they find objectionable, their duty is to implement the statutory mandates in a rational manner. *See Motor Vehicle Manufacturers Association,* 103 S.Ct. at 2875 n. * (Rehnquist, J., concurring) ("Of course, a new administration may not choose not to enforce laws of which it does not approve . . . .").

■ The Fair Labor Standards Act was passed to protect employees and employers from the consequences of oppressive wages. The Secretary's failure to engage in reasoned decisionmaking before rescinding a longstanding tool for enforcing the Act has imperiled the attainment of this objective in an industry employing 63,000 workers. This abdication of his statutory responsibility cannot survive judicial scrutiny.

For the foregoing reasons, we reverse the decision of the District Court and vacate the Secretary's rescission of homework restrictions in the knitted outerwear industry. The case is remanded to the District Court with instructions to return the matter to the Secretary for further proceedings as may be warranted. The restriction against industrial homework shall be reinstated and remain in effect unless properly modified pursuant to "reasoned decisionmaking" consistent with the opinion of this court.

*So ordered.*

workers that were formerly lost to foreign competition, could be realized." *International Ladies' Garment Workers' Union v. Donovan,* Civ. No. 81–2606, mem. op. at 11 (D.D.C. July 23, 1982), *reprinted in* II J.A. 613. The District

Court's speculation is also hard to reconcile with its earlier speculation that the number of homeworkers has declined because of their inefficiency relative to factory workers. *Id.* at 10, II J.A. 612.